709 So.2d 1364 (1998)
David HARRELL, Petitioner,
v.
STATE of Florida, Respondent.
No. 90114.
Supreme Court of Florida.
April 23, 1998.
*1366 Bennett H. Brummer, Public Defender, and Donald Tunnage, Assistant Public Defender, Eleventh Judicial Circuit, Miami, for Petitioner.
Robert A. Butterworth, Attorney General, and Richard L. Polin, Assistant Attorney General, Miami, for Respondent.
David Henson of Kirkconnell, Lindsey, Snure and Henson, P.A., Winter Park, and Elliot H. Scherker of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, for Florida Association of Criminal Defense Lawyers, Amicus Curiae.
HARDING, Justice.
We have for review Harrell v. State, 689 So.2d 400 (Fla. 3d DCA 1997), in which the Third District Court of Appeal certified the following question as being one of great public importance:
DOES THE ADMISSION OF TRIAL TESTIMONY THROUGH THE USE OF A LIVE SATELLITE TRANSMISSION VIOLATE THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, OR ARTICLE I, SECTION 16 OF THE FLORIDA CONSTITUTION, WHERE A WITNESS RESIDES IN A FOREIGN COUNTRY AND IS UNABLE TO APPEAR IN COURT?
Id. at 406. We have jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution. We answer the question in the negative.
David Harrell was charged with robbery and burglary of a conveyance. The facts of the case are as follows. Pedro Mielniczuk and Perla Scandrojlio, a married couple from *1367 Argentina, were on vacation in Florida. The couple was robbed near the Miami Airport while attempting to return their rental car. The couple was lost and stopped to ask a man for directions. After being handed a map, the man reached into the car and grabbed the couple's belongings. Before returning to Argentina, Scandrojlio identified Harrell in a photographic line-up. Harrell's fingerprints also matched the prints lifted from the couple's map. Harrell was subsequently arrested and tried for the crime.
Before the trial, the State requested to introduce the testimony of the two victims via satellite transmission. The State argued that satellite transmission was necessary because the victims were unable to be physically present in the courtroom, both because of the distance between the United States and Argentina and because of health problems that Scandrojlio was experiencing. Over Harrell's objection, the trial judge agreed to allow the testimony via satellite.
The following procedure was used at trial. There were two cameras in the courtroom in Miami. One camera filmed the jury and another filmed the attorneys and the defendant. The judge was not filmed. There was also a screen in the courtroom which allowed the people in the courtroom to see the witness in Argentina. In Argentina, there was a camera which filmed the witness and a screen which allowed the witness to see the courtroom in Miami. The system permitted the defendant in Miami and the witness in Argentina to observe each other. The oath was administered to each witness by a deputy clerk in Miami, in the presence of the jury and the judge. Because the witnesses did not speak English, an interpreter was used.
Some problems occurred during the satellite transmission. The visual transmission of the victims' testimony was not simultaneous with the audio, causing a split-second delay between what was said and what was seen. Further, while Scandrojlio was testifying, she repeatedly looked at an individual off the screen. The individual off the screen was Maria Alvarez, who was the manager of the broadcast studio in Argentina. Initially, the cameras focused only on Scandrojlio and not on Alvarez. This problem was corrected and the camera focused on both individuals.
Harrell was subsequently found guilty and he appealed his conviction to the Third District Court of Appeal. The district court upheld the conviction in Harrell v. State, 689 So.2d 400 (Fla. 3d DCA 1997). The district court concluded that the procedure did not violate the Confrontation Clause and certified the question to this Court.
The issues for this Court on appeal are whether or not testimony via satellite in a criminal case violates the Confrontation Clause and, if so, whether the satellite procedure constitutes a permissible exception. This question is one of first impression for our Court. However, we are guided by other cases dealing with the Confrontation Clause in analogous situations (i.e., closed-circuit television) that were decided by this Court and the United States Supreme Court.
The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with witnesses against him...." Similarly, article I, section 16(a) of the Florida Constitution states: "In all criminal prosecutions the accused ... shall have the right ... to confront at trial adverse witnesses...." This concept of confrontation has been a cornerstone of Western society for a number of centuries. The Bible quotes the Roman Governor Festus as saying, "It is not the manner of the Romans to deliver any man up to die before the accused has met his accuser face to face, and has been given a chance to defend himself against the charges." Coy v. Iowa, 487 U.S. 1012, 1015-16, 108 S.Ct. 2798, 2800, 101 L.Ed.2d 857 (1988) (quoting Acts 25:16 and a statement made while the Apostle Paul was a prisoner). Many argue [1] that the founders of *1368 this country wanted to include the Confrontation Clause in the Bill of Rights to prevent against ex parte affidavits, which allowed individuals to be convicted without ever laying eyes on their accusers. See California v. Green, 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970).[2] Providing criminal defendants the opportunity to confront their accusers imparts a component of reliability on the judicial process.
In addition to allowing for face-to-face confrontation, the Confrontation Clause serves other important interests. As the United States Supreme Court stated in Mattox v. United States:
The primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.
156 U.S. 237, 242-43, 15 S.Ct. 337, 339-40, 39 L.Ed. 409 (1895). Thus, the Confrontation Clause also ensures (1) that the witness will give the testimony under oath, impressing upon the witness the seriousness of the matter and protecting against a lie by the possibility of penalty of perjury, (2) that the witness will be subject to cross-examination, and (3) that the jury will have the chance to observe the demeanor of the witness, which aids the jury in assessing credibility. See Maryland v. Craig, 497 U.S. 836, 851, 110 S.Ct. 3157, 3166, 111 L.Ed.2d 666 (1990).
Although the Confrontation Clause guarantees a criminal defendant the right to physically confront accusers, this right is not absolute. See id. at 849-51, 110 S.Ct. at 3165-66. There are certain exceptions where a defendant's right of face-to-face confrontation will give way to "considerations of public policy and the necessities of the case." Id. at 849, 110 S.Ct. at 3165 (quoting Mattox, 156 U.S. at 243, 15 S.Ct. at 340). However, such exceptions are only permitted when the reliability of the testimony is otherwise assured. See Craig, 497 U.S. at 850, 110 S.Ct. at 3166. Reliability can be exhibited through the other three elements of confrontationoath, cross-examination, and observation of the witness's demeanor. Id. at 851, 110 S.Ct. at 3166.
The State is urging this Court to conclude that the satellite procedure used in this case is the equivalent of physical, face-to-face confrontation. We decline to make such a finding. But see United States v. Gigante, 971 F.Supp. 755, 759 (E.D.N.Y. 1997) ("[T]he [two-way closed circuit television procedure] proposed by the government in this case satisf[ies] fully the requirements of the Constitution...."). At its essence, a trial in 1791, the year the Sixth Amendment was ratified, involved attorneys and parties, witnesses, a jury, and a judge, all of whom physically appeared in a courtroom. The same holds true for a trial today. We are unwilling to develop a per se rule that would allow the vital fabric of physical presence in the trial process to be replaced at any time by an image on a screen. Perhaps the "virtual *1369 courtroom" will someday be the norm in the coming millennium; for now, we do not conclude that virtual presence is the equivalent of physical presence for the purposes of the Confrontation Clause.
Therefore, the satellite procedure can only be approved as an exception to the Confrontation Clause. In order to qualify as an exception, the procedure must (1) be justified, on a case-specific finding, based on important state interests, public policies, or necessities of the case and (2) must satisfy the other three elements of confrontationoath, cross-examination, and observation of the witness's demeanor. See Craig, 497 U.S. at 849-51, 110 S.Ct. at 3165-66.
The first part of our analysis begins with the public policy considerations and necessities of this case and whether these circumstances were enough to justify an exception to the Confrontation Clause. In making this determination, we look to the analogous case of Glendening v. State, 536 So.2d 212 (Fla. 1988). In Glendening, this Court held that it was not a violation of the Confrontation Clause to allow the introduction of an allegedly abused child's videotaped testimony. We recognized the important State interest and public policy consideration of "sparing child victims of sexual crimes the further trauma of in-court testimony." Id. at 217 (quoting Chambers v. State, 504 So.2d 476, 477-78 (Fla. 1st DCA 1987)).
Similarly, we find that public policy reasons exist in the present case which would also justify an exception to face-to-face confrontation. First, the witnesses in this case lived beyond the subpoena power of the court. See, e.g., § 27.04, Fla. Stat. (1995);[3] § 27.53, Fla. Stat (1995);[4]Green v. State, 377 So.2d 193, 202 (Fla. 3d DCA 1979) ("The law is well-settled that the defendant in a criminal case is constitutionally entitled to compulsory process to have brought into the trial court any material evidence shown to be available and capable of being used by him in aid of his defense.... The constitutional right to compulsory process means not only the issuance and service of a subpoena by which a defense witness is made to appear, but includes the judicial enforcement of that process and the essential benefits of it by the trial court."), approved, 395 So.2d 532 (Fla. 1981). Thus, there was no way to compel these witnesses to appear in court. See United States v. Zabaneh, 837 F.2d 1249, 1259-60 (5th Cir.1988) (stating that "the United States courts lack power to subpoena witnesses, (other than American citizens) from foreign countries"); United States v. Best, 76 F.Supp. 138, 139 (D.Mass.1948).[5] We find this to be a very important consideration,[6] *1370 for it is clearly in our state's interest to expeditiously and justly resolve criminal matters that are pending in the state court system.
Second, there was evidence in this case that one of the witnesses was in poor health and could not make the trip to this country. This is also a important consideration.
Finally, the two Argentinean witnesses were absolutely essential to this case. As stated earlier, there is an important state interest in resolving criminal matters in a manner which is both expeditious and just. In order to do that in this case, the testimony of these two witnesses was a necessity.
These three concerns, taken together, amount to the type of public policy considerations that justify an exception to the Confrontation Clause. Thus, the first prong of our analysis is satisfied.
We are mindful of the possible difficulty in determining when the satellite procedure should be employed. We are also aware of the possibility that such a procedure can be abused. Therefore, we are establishing the following guidelines to aid in making this decision. The determination is not simply a mathematical calculation, based on the number of alleged public policy interests or state interests. Rather, the proper approach for determining when the satellite procedure is appropriate involves a finding similar to that of rule 3.190(j) of the Florida Rules of Criminal Procedure. Rule 3.190(j) provides the circumstances under which and the procedure by which a party can take a deposition to perpetuate testimony for those witnesses that are found to be unavailable. The rule states in relevant part:
(j) Motion to Take Deposition to Perpetuate Testimony.
(1) After an indictment or information on which a defendant is to be tried is filed, the defendant or the state may apply for an order to perpetuate testimony. The application shall be verified or supported by the affidavits of credible persons that a prospective witness resides beyond the territorial jurisdiction of the court or may be unable to attend or be prevented from attending a trial or hearing, that the witness's testimony is material, and that it is necessary to take the deposition to prevent a failure of justice. The court shall order a commission to be issued to take the deposition of the witnesses to be used in the trial and that any designated books, papers, documents, or tangible objects, not privileged, be produced at the same time and place. If the application is made within 10 days before the trial date, the court may deny the application.
Fla. R.Crim. P. 3.190(j). We find that depositions to perpetuate testimony are analogous to the satellite procedure used in this case. In fact, the satellite procedure provides the defendant with more guarantees under the Confrontation Clause than the deposition, for the defendant is afforded a live, contemporaneous opportunity to cross-examine the witness and the jury can observe the witness's demeanor during this exchange.[7]
*1371 Thus, in all future criminal cases where one of the parties makes a motion to present testimony via satellite transmission, it is incumbent upon the party bringing the motion to (1) verify or support by the affidavits of credible persons that a prospective witness resides beyond the territorial jurisdiction of the court or may be unable to attend or be prevented from attending a trial or hearing and (2) establish that the witness's testimony is material and necessary to prevent a failure of justice. Upon such a showing, the trial judge shall allow for the satellite procedure.[8]
The second part of our analysis concerns whether the procedure in this case satisfied the additional safeguards of the Confrontation Clauseoath, cross-examination, and observation of the witness's demeanor. We conclude that it did. Both of the witnesses were placed under oath by a court clerk in Miami. Further, the defense had an opportunity to cross-examine the witnesses. Finally, the procedure allowed the jury to observe the witnesses as they testified, and it also allowed the witnesses to see the jury. Because each of these additional safeguards was present in the satellite procedure, we are convinced that the witnesses' testimony was sufficiently reliable. Thus, the second prong of our analysis is satisfied.
However, some important caveats exist in regards to the oath, cross-examination, and observation of the witness's demeanor. First, an oath is only effective if the witness can be subjected to prosecution for perjury upon making a knowingly false statement. Craig, 497 U.S. at 845-46, 110 S.Ct. at 3163-64 (stating that the Confrontation Clause provides for a witness to testify under oath, and thus "guard[s] against [a] lie by the possibility of a penalty for perjury"). To ensure that the possibility of perjury is not an empty threat for those witnesses that testify via satellite from outside the United States, it must be established that there exists an extradition treaty between the witness's country and the United States, and that such a treaty permits extradition for the crime of perjury. In the present case, an extradition treaty does exist between the United States and Argentina. See Extradition, Sept. 15, 1972, U.S.-Arg., 23 U.S.T. 3501. The treaty permits extradition for all of the offenses listed in Article 2, "provided that these offenses are punishable by the laws of both Contracting Parties by deprivation of liberty for a maximum period exceeding one year." Id. Item 21 of Article 2 includes "[f]alse statements, accusations or testimony effected before a government agency or official." Id. In Florida, section 837.02, Florida Statutes (1995), states that the offense of perjury in an official proceeding is a third-degree felony and is punishable by up to five years in prison. Similarly, chapter 12, article 275 of the Argentine Penal Code punishes witnesses who give false testimony in criminal actions by up to ten years in prison, if such testimony prejudices the defendant. Ch. 12, art. 275, CÓD. PEN. (1991). Thus, the witnesses in this case were subject to a possible penalty for perjury, and the oath component of the Confrontation Clause was satisfied.
*1372 We also acknowledge that possible audio and visual problems can develop with satellite transmission. It is incumbent upon the trial judge to monitor such problems and to halt the procedure if these problems threaten the reliability of the cross-examination or the observation of the witness's demeanor.
Our Court is mindful of the importance of today's decision. Yet, we are also mindful that our society, and indeed the world, is in the midst of the Information Age. Computers are the norm in American households and businesses; an infinite amount of information is available at our fingertips through the Internet; and satellite technology allows us to travel the world without ever leaving our living rooms.
The legal profession has also benefitted from these technological innovations. Legal research that once took hours or days is now available in seconds through computer and Internet databases. Clients can reach their attorneys anywhere in the world through the use of cellular and video innovations. The list goes on and on.
Indeed, our very own Court takes pride in the recent technological advancements that have been made. Oral arguments before the Court are broadcast live via satellite throughout the state. These same arguments can be viewed online, along with the parties' briefs. The Florida Supreme Court Website has received worldwide acclaim for opening up the courthouse doors to the general public. All of these steps provide greater access to the judicial system, which in turn increases public trust and awareness.
That being said, it becomes quite clear that the courtrooms of this state cannot sit idly by, in a cocoon of yesteryear, while society and technology race towards the next millennium. Fortunately, the courtrooms of this state have not been idle, nor are they speeding at a reckless pace. Recent changes in the courtroom have included the use of audiotape stenographers as well as video transmission of first appearances, arraignments, and appellate oral arguments, just to name a few.
We recognize that there are generally costs associated with change. Nevertheless, technological changes in the courtroom cannot come at the expense of the basic individual rights and freedoms secured by our constitutions. We are confident that the procedure approved today, when properly administered, will advance both the access to and the efficiency of the justice system, without compromising the expectation of the safeguards that are secured to criminal defendants.
Our nation's Constitution is a living document that has stood the test of time and change. This point is exemplified by the fact that our Constitution is still viable today some two hundred-plus years after our country's birth. There was no way the founders of this nation could have foreseen the innovations that would take place throughout our country's lifetimechanges that, up to this point, have included advances in communication, electricity, train, airplane, and automobile transportation, and even space exploration. Nor can we predict today the changes yet to come. But we can say with certainty that our Constitution, as well as this great nation, can endure any future changes while at the same time ensuring that individual rights and liberties will be upheld.
Accordingly, for the reasons stated above, we answer the certified question in the negative and approve the result that was reached by the Third District Court of Appeal.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, WELLS and ANSTEAD, JJ., and GRIMES, Senior Justice, concur.
NOTES
[1] There has been a recent debate among scholars as to the origins of the Confrontation Clause and exactly what its purpose was. This conflict culminated in the recent United States Supreme Court case of White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). In White, the United States as amicus curiae argued that the limited purpose of the Confrontation Clause was to prevent ex parte affidavits. See id. at 352, 112 S.Ct. at 740-41. However, the majority opinion rejected this limited interpretation of the Confrontation Clause, stating that "[s]uch a narrow reading of the Confrontation Clause which would virtually eliminate its role in restricting the admission of hearsay testimony, is foreclosed by our prior cases." Id.
[2] The Court in Green also discussed the notorious trial of Sir Walter Raleigh and the role that trial had in the development of the Confrontation Clause. The Court stated:

A famous example is provided by the trial of Sir Walter Raleigh for treason in 1603. A crucial element of the evidence against him consisted of the statements of one Cobham, implicating Raleigh in a plot to seize the throne. Raleigh had since received a written retraction from Cobham, and believed that Cobham would now testify in his favor. After a lengthy dispute over Raleigh's right to have Cobham called as a witness, Cobham was not called, and Raleigh was convicted. See 1 Stephen, supra, at 333-336; 9 Holdsworth, supra, at 216-217, 226-228. At least one author traces the Confrontation Clause to the common-law reaction against these abuses of the Raleigh trial. See F. Heller, The Sixth Amendment 104 (1951).
California v. Green, 399 U.S. 149, 157 n. 10, 90 S.Ct. 1930, 1934 n. 10, 26 L.Ed.2d 489 (1970).
[3] Section 27.04 states:

The state attorney shall have summoned all witnesses required on behalf of the state; and he or she is allowed the process of his or her court to summon witnesses from throughout the state to appear before the state attorney in or out of term time at such convenient places in the state attorney's judicial circuit and at such convenient times as may be designated in the summons, to testify before him or her as to any violation of the criminal law upon which they may be interrogated, and he or she is empowered to administer oaths to all witnesses summoned to testify by the process of his or her court or who may voluntarily appear before the state attorney to testify as to any violation or violations of the criminal law.
§ 27.04, Fla. Stat. (1995).
[4] Section 27.53(1) states in relevant part:

Each assistant public defender appointed by a public defender under this section shall serve at the pleasure of the public defender. Each investigator employed by a public defender shall have full authority to serve any witness subpoena or court order issued, by any court or judge within the judicial circuit served by such public defender, in a criminal case in which such public defender has been appointed to represent the accused.
§ 27.53(1), Fla. Stat. (1995).
[5] We note that there are procedures whereby this state can subpoena witnesses who reside in other states in this country. See Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings § 1-9, 11 U.L.A. 1-53 (1995). It appears that every state in the union has adopted this Uniform Act in some form. See State v. Breeden, 333 Md. 212, 634 A.2d 464, 469 (1993); see e.g., §§ 942.01-06, Fla. Stat. (1995); Ala.Code, §§ 12-21-280-285 (1995); Ga.Code Ann. §§ 24-10-90-97 (1995).

Additionally, there are procedures that allow courts in the United States to issue subpoenas for witnesses outside of the country if those witnesses are citizens of the United States. See United States v. Best, 76 F.Supp. 138, 139 (D.Mass.1948).
[6] Although this is an important consideration, it is not a mandatory prerequisite. In other words, we are not saying today that the satellite procedure can only be used for witnesses who reside outside of this state. We can envision situations where a witness in Tallahassee, who is unable to travel due to illness or disability, can testify via satellite in a courtroom in Miami. However, in every criminal case, there is a strong presumption in favor of face-to-face testimony. The burden would be on the moving party to provide substantial justification as to why a person who lives within the reach of the court's subpoena power should not be required to be physically present to testify.
[7] A defendant in Florida has a right to be present at a deposition to perpetuate testimony. See Fla. R.Crim. P. 3.190(j). Similarly, a defendant in federal court also has a right to be present at a deposition to perpetuate testimony. See Fed. R.Crim. Proc. 15. Nevertheless, federal courts in this country have permitted deposition testimony of foreign witnesses to be introduced at trial, despite the fact that the defendant was not physically present at the deposition. See United States v. McKeeve, 131 F.3d 1 (1st Cir.1997); United States v. Kelly, 892 F.2d 255 (3d Cir. 1989); United States v. Salim, 855 F.2d 944 (2d Cir.1988). In McKeeve, the First Circuit Court of Appeal pointed out that it is not always possible for a defendant to be physically present at depositions which take place outside of this country. The U.S. Marshals Service lacks jurisdiction to retain custody of federal detainees on foreign soil. McKeeve, 131 F.3d at 7. Therefore, the government of the country where the deposition is taking place would have to agree to assume custody of the defendant during the time the defendant was in the foreign country attending the deposition. Id. In McKeeve, the United Kingdom refused to assume temporary custody of the defendant. Id.

Harrell argues that a defendant is afforded more rights under the Confrontation Clause through a deposition to perpetuate testimony than by the satellite procedure used in this case. We disagree. The satellite procedure always provides both the defendant and the jury the opportunity to observe the witness, and vice versa. Moreover, in cases involving foreign witnesses, use of the satellite procedure will prevent the problems that occurred in McKeeve. For instance, had Harrell requested to be present at a deposition of the witnesses in Argentina, the Argentinean government might have refused to assume custody of Harrell during the deposition, thus preventing Harrell from having any face-to-face contact with the witnesses. Assuming this problem would have occurred, the satellite procedure used in this case certainly afforded Harrell more rights under the Confrontation Clause than he would have received through a deposition to perpetuate testimony.
[8] If the parties are in conflict as to whether the satellite procedure or a deposition to perpetuate testimony is more appropriate, the decision shall be left up to the discretion of the trial judge based on whichever procedure the judge feels will better serve justice. There may be circumstances where both procedures are appropriate.