WALLACE, Judge,
Concurring.
I concur fully in Judge Black’s well-reasoned majority opinion and in the certification of the question to the Florida Supreme Court. I write separately to explain why I think that the manner in which the trial judge has exercised his authority to conduct involuntary placement hearings is unwarranted. I also explain why I believe that conducting such hearings remotely by videoconference is inappropriate and ill-advised. Finally, I suggest that the appropriate rules committees of The Florida Bar should promptly draft and submit to the Florida Supreme Court proposed rules that will delineate the types of proceedings that a judge may conduct remotely by videoconference and those that the judge may not.
I. INTRODUCTION
There is a dearth of authority on the question whether a trial judge may preside remotely at a trial or a final evidentiary hearing by the medium of videoconferencing equipment. But cf. Commonwealth v. Bergstrom, 402 Mass. 534, 524 N.E.2d 366, 376-77 (1988) (stating in dicta that the substitution of a television monitor for the judge’s personal presence at a criminal trial is inadequate). The reason for this dearth of authority is obvious: to date few trial judges have chosen to preside over such important matters remotely by video-conference instead of being physically present. Most of the case law and secondary sources on the use of audiovisual equipment at trials address the issue of the admissibility of testimony by witnesses from remote locations, not the remote appearance of the presiding officer. See, e.g., Harrell v. State, 709 So.2d 1364 (Fla. 1998); Slawinski v. State, 895 So.2d 483 (Fla. 4th DCA 2005); Lima v. State, 732 So.2d 1173 (Fla. 3d DCA 1999); Michael R. Rocha, Going Too Far in United States v. Yates: The Eleventh Circuit’s Application of Maryland v. Craig to Two-Way Videoconferencing, 36 Stetson L. Rev. 365 (2007); Marc Chase McAllister, Two-Way Video Trial Testimony and the Confrontation Clause: Fashioning a Better Craig Test in Light of Crawford, 34 Fla. St. U. L. Rev. 835 (2007).
For a question of the kind that we address here, one naturally turns to the rules of procedure for guidance. Unfortunately, the rules offer little help. The Florida *160 rule regarding the use of communication equipment states, in pertinent part:
(a) Definition. Communication equipment means a conference telephone or other electronic device that permits all those appearing or participating to hear and speak to each other, provided that all conversation of all parties is audible to all persons present.
(b) Use by All Parties. A county or circuit court judge may, upon the court’s own motion or upon the written request of a party, direct that communication equipment be used for a motion hearing, pretrial conference, or a status conference. A judge must give notice to the parties and consider any objections they may have to the use of communication equipment before directing that communication equipment be used. The decision to use communication equipment over the objection of parties will be in the sound discretion of the trial court, except as noted below.
[[Image here]]
(f) Override of Family Violence Indicator. Communications equipment may be used for a hearing on a petition to override a family violence indicator under Florida Family Law Rule of Procedure 12.650.
Fla. R. Jud. Admin. 2.530 (emphasis added). Other sections of the rule address the procedure for the use of communication equipment when requested by fewer than all of the parties and the taking of testimony from a witness by communication equipment. Fla. R. Jud. Admin. 2.530(c), (d). Thus the rule tells us only that communication equipment may be used for a motion hearing, a pretrial conference, a status conference, or for a hearing on a petition to override a family violence indicator. The rule does not address the issue of whether a trial judge may preside remotely by videoconference equipment at a trial or a final evidentiary hearing except by a rather weak negative inference. The absence of any guidance on this important question is one of the reasons that—as Judge Black points out—it is difficult to find an indisputable legal duty on the part of a trial judge to be physically present at a trial.
II, TWO PROBLEMS WITH THE PROCEEDINGS IN THE TRIAL COURT

A. The Absence of a Proper Court Order

As an initial matter, I think that the circumstances of the trial court’s decision to preside remotely over the involuntary placement hearings in Lee County are problematic. The State supports its argument for the denial of the petition with the complaint that “[pjetitoners have not provided a copy of a court order to support his or her arguments.” Well, yes, that is precisely one of the problems with the proceedings in the trial court. There is no court order providing that the trial judge will preside over the involuntary placement hearings remotely through the medium of videoconferencing equipment. Instead, this drastic change to the procedure by which these hearings have previously been conducted in Lee County was initiated by a one-line e-mail dated March 30, 2016, from the trial judge’s judicial assistant. This e-mail stated only that the trial court would “be doing Baker Acts beginning this Friday [, April 1, 2016,]” by video. Thus the change from a hearing at which the trial judge would be physically present to a remote appearance by the judge by means of videoconferencing equipment was made on the basis of an email from the trial judge’s judicial assis *161 tant.[5]
Changes of this magnitude across a county or a judicial circuit in the way in which a court conducts its business are properly made by administrative order. An administrative order is “[a] directive necessary to administer properly the court’s affairs but not inconsistent with the constitution or with court rules and administrative orders entered by the supreme court.” Fla. R. Jud. Admin. 2.120(c). Other courts provide for the conduct of some proceedings where the judge presides remotely by videoconferencing equipment. For example, in the Thirteenth Judicial Circuit, a judge presides remotely over various proceedings involving incarcerated defendants. But the use of audiovisual devices to conduct such hearings is specifically authorized by administrative order. First Appearance/Emergency Criminal Division “0”, Administrative Order S-2016-029 (Fla. 13th Jud. Cir. July 1, 2016). The assigned judge does not announce by an e-mail that he will be presiding over such hearings remotely.
The adoption of a procedure for a judge to preside remotely over certain proceedings by administrative order is significantly different than having the judge take such action by a private e-mail for at least three reasons. First, unlike an e-mail, an administrative order must be indexed and recorded by the clerk of the court in each county where the order is effective. Fla. R. Jud. Admin. 2.215(e)(3). A set of the recorded copies must be available for inspection as a public record. Id. In fact, the administrative orders of each circuit are generally posted on each judicial circuit’s website. Unlike an e-mail, an administrative order is a public document available to all.
Second, administrative orders must be signed by the chief judge of the circuit. Fla. R. Jud. Admin. 2.215(b)(2); State ex rel. Times Publ'g Co. v. Patterson, 451 So.2d 888, 891 (Fla. 2d DCA 1984). The chief judge is elected by a majority of the active circuit and county court judges within the circuit. Fla. R. Jud. Admin. 2.215(c). The chief judge of the circuit is ultimately responsible to the chief justice of the supreme court. Fla. R. Jud. Admin. 2.215(b)(2). Thus the power to enter administrative orders and the responsibility for them lies exclusively in the chief judge of the circuit.[6] An individual judge who is not the chief judge of the circuit lacks the authority to enter what amounts to an administrative order. Dep’t of Juvenile Justice v. Soud, 685 So.2d 1376, 1378 (Fla. 1st DCA 1997). It is an open question whether the trial judge had the authority to accomplish by a private e-mail what was tantamount to an administrative order governing the conduct of hearings for involuntary placements in Lee County.[7]
Third, an administrative order—unlike an e-mail—is subject to review by writ of certiorari. 1-888-Traffic Sch. v. Chief Circuit Judge, Fourth Judicial Circuit, 734 So.2d 413, 415 (Fla.1999); Hatcher v. Davis, 798 So.2d 765, 765-66 (Fla. 2d DCA 2001); Norris v. State, 737 So.2d 1240, 1240 (Fla. 5th DCA 1999). The trial judge’s decision to change the procedure for conducting involuntary placement hear *162 ings in Lee County by e-mail instead of seeking the entry of an appropriate administrative order by the chief judge of the circuit effectively deprives the petitioners of a means of seeking review that might otherwise have been available to them.

B. The Absence of an Explanation

The trial judge must have had a reason for deciding to begin presiding over the involuntary placement hearings remotely. Unfortunately, we do not know what that reason is. I have studied the petition, the response, and the reply, together with the multiple appendices filed in these cases. None of the parties have offered any clue in this blizzard of paper to the reason underlying the judge’s decision to start— in the words of his judicial assistant— “doing Baker Acts beginning this Friday” by video. Thus we are left to guess about what prompted the trial judge to take this step. Three possible reasons occur to me: cost, efficiency, and security. But, for the reasons outlined below, none of these explanations provides a satisfactory answer.
With regard to the factor of cost, I note that the involuntary placement hearings are already being conducted at the two receiving facilities, Salus Care and Park Royal Hospital. Under the new arrangement, the assistant public defender, the assistant state attorney, the court reporter, and any other court personnel will still need to travel to the receiving facilities to participate in the hearings. The only cost savings will be in the trial judge’s expenses for mileage. Based on the short distances involved, these costs are minimal. Any savings on the judge’s mileage would be substantially exceeded by the cost of acquiring the necessary videoconferencing equipment and its maintenance. To the extent that the court must employ additional personnel to operate or to maintain the equipment, those costs would be additional.
With regard to efficiency, having the trial judge preside over the involuntary placement hearings from a remote location does not result in a significant increase in judicial efficiency. The distance from the Lee County Justice Center to Salus Care is a little over five miles. The distance to Park Royal Hospital is a little farther at almost eleven miles. The trip to Salus Care could be made in fifteen minutes or less; the drive to Park Royal Hospital would take less than thirty minutes. Thus the time that the judge must devote to travelling to and from these locations is minimal. And to the extent that any driving time for the judge is saved, such efficiencies must be balanced against the time that will inevitably be lost as a result of difficulties encountered in using the equipment and other factors that may not be anticipated. More important, the decision to preside over involuntary placement hearings from a remote location sends a message to the patients and the other participants in the proceedings that the judge does not regard these matters as sufficiently important to warrant a personal appearance. Cf. Ronnie Thaxton, Injustice Telecast: The Illegal Use of Closed Circuit Television Arraignments and Bail Bond Hearings in Federal Court, 79 Iowa L. Rev. 175, 201-02 (1993) (observing that where the judge presides over bond hearings and arraignments from a remote location “[djefendants and family members may receive the impression that courts consider their cases too trivial for in-person appearances”). The court system should avoid promoting the perception by participants in Baker Act hearings that the judge views the patients’ liberty interest as unimportant. Taking all of these matters into account, a quest for efficiency does not adequately explain—much less justify—the *163 trial judge’s decision to preside over these hearings from a remote location.
The third possible explanation involves concerns about security. But there is nothing in our record to suggest that security at either of the receiving facilities where the hearings are held has ever been a problem. And we have no hint that a concern for security or personal safety is what has motivated the trial judge’s decision to appear remotely at these hearings.
III. CONDUCTING BAKER ACT HEARINGS BY VIDEO IS ILL-ADVISED

A. The Problems with Conducting Trials and Evidentiary Hearings by Video

The use of videoconferencing equipment to conduct meetings for participants at two or more locations has become common in government and business. This court regularly uses such equipment to conduct conferences between its staff at the headquarters in Lakeland and at the Tampa branch. However, the use of videoconferencing equipment to conduct trials and evidentia-ry hearings involves multiple difficulties. Such difficulties include, but are not limited to: (1) equipment malfunctions; (2) problems in using the equipment, e.g., the inability to determine who is speaking and participants “talking over” each other; (3) problems with handling documents; (4) the inability of counsel to approach the bench for a private conference; (5) an adverse impact on the relationship between counsel and the court; (6) the loss of normal eye contact and the ability to perceive and assess nonverbal cues, leading to difficulties in assessing credibility and emotion; (7) the perception reported by many that conducting trials and evidentiary hearings by video results in the isolation of the participants and the court, causing dehumanizing effects on everyone involved; and (8) an undermining of the dignity and solemnity traditionally associated with judicial proceedings.[8] As I will discuss in the next section of this opinion, many of these difficulties are exacerbated when proceedings for the involuntary placement of persons under the Baker Act are conducted by video.

B. Disregarding the Recommendations of the Experts

In considering the matter under review, it is important to bear in mind that this very issue has already been investigated and studied by a distinguished panel of judges, attorneys, and experts in mental health policy and the problems affecting the elderly. A subcommittee appointed by the Florida Supreme Court in 1997 conducted a comprehensive study of the administration of the Baker Act and its impact on patients, particularly Florida’s *164 elderly population. The subcommittee released its report on December 28, 1999 (the Report). Subcommittee on Case Administration, Judicial Administration of the Baker Act and Its Effect on Florida’s Elders; Report and Recommendations of the Subcommittee on Case Administration (1999); available at http://www.florida supremecourt.org/pub_info/documents/ BakerFinalReportpdf; see also Mark D. Killian, Fairness Commission Says Baker Act is in Need of an Overhaul, Fla. Bar News, Vol. 27, No. 8 (2000), at 13 (noting the acceptance of the Report by Major B. Harding, then the Chief Justice of the Florida Supreme Court).
In the Report, the subcommittee addressed the conduct of involuntary placement hearings by video. The subcommittee noted that when involuntary placement hearings are held in receiving facilities—as is the case here—patients frequently do not understand that a formal court hearing is taking place. Report at 19. The subcommittee devoted a separate section of the Report to a consideration of the effects of conducting involuntary placement hearings on a population of vulnerable patients by video. Id. at 31-32. The subcommittee recounted the evidence that it received concerning the negative effects of conducting video hearings on patients experiencing mental health issues as follows:
Martha Lenderman pointed out that some individuals’ mental health problems include symptoms of paranoia. These persons may react negatively to video hearings. Some individuals with mental illnesses may be too confused to understand a procedure involving a video hearing. Further, the presiding officer may be limited in observing the situation when confined to viewing only what a camera is focused on. Ms. Lend-erman warned that video be used with caution, if at all, for involuntary placement hearings.
Vince Smith, of the Mental Health Program Office in the Department of Children and Families, was concerned that use of video may increase the number of individuals who decline to participate in them involuntary placement hearings. Winifred Sharp, a Judge on the Fifth District Court of Appeal, observed that it would be very difficult to make a video proceeding look or feel like a formal court hearing, and therefore the chance that a patient might not understand a court proceeding is occurring would continue to present a challenge.
Id. Based on the evidence before it, the subcommittee issued a strong recommendation against the use of video for involuntary placement hearings. Id. at 32.
The Public Defender of the Twentieth Judicial Circuit brought the Report and its recommendations to the attention of the trial court before the new procedure went into effect. For reasons unexplained in our record, the trial court decided to proceed with the video hearings despite the evidence received by the subcommittee and its well-considered recommendation against conducting Baker Act hearings by video.

C. Disregarding the Lessons of Experience

Despite the novelty of the legal issue presented in this ease, the Florida courts have substantial experience with the effect of video hearings on a vulnerable population. Indeed, we’ve seen this movie before. In 1999, the Florida Supreme Court adopted on an interim basis an amendment to Florida Rule of Juvenile Procedure 8.100(a) that authorized juveniles to attend juvenile hearings through the use of audio visual equipment. Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 753 So.2d 541 (Fla.1999). The court’s adoption *165 of the amendment to the rule followed a one-year pilot program that authorized chief judges in the fifth, ninth, thirteenth, seventeenth, and nineteenth judicial circuits to allow juveniles to attend detention hearings by audiovisual device. Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 667 So.2d 195 (Fla.1996).
The results of the implementation of the amended rule were mixed. Proponents pointed to advantages such as improved safety, elimination of the need to transport juveniles from detention facilities to the courthouse, the resulting allowance of more time for juvenile inmates to pursue counseling and their studies, and the avoidance of the degrading spectacle of parading handcuffed and shackled juveniles through the courthouse. Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 796 So.2d 470, 472 (Fla.2001). Critics of the amendment—particularly the Florida Public Defenders’ Association— pointed to a variety of problems with the new procedure. Id. at 473. After weighing the advantages and disadvantages of the program, a divided court decided to repeal the amendment and to eliminate the use of videoconferences for juvenile detention hearings. Id. at 471; see generally Gerald G. Ashdown & Michael A. Menzel, The Convenience of the Guillotine: Video Proceedings in Federal Prosecutions, 80 Denv. U. L. Rev. 63, 79-84 (2002) (discussing Florida’s experiment with videoconferencing for juvenile detention hearings).
The court discussed the difficulties that had been experienced with the use of videoconferencing for juvenile detention hearings as follows:
Independent observations confirmed the fears expressed by all who have strongly and continuously opposed the adoption of the proposed robotic procedure. Specifically, many observed that there was no proper opportunity for meaningful, private communications between the child and the parents or guardians, between the parents or guardians and the public defender at the detention center, and between a public defender at the detention center and a public defender in the courtroom. The mechanical process produced a proceeding where, on many occasions, multiple parties would speak at once, adding to the confusion. At the conclusion of far too many hearings, the child had no comprehension as to what had occurred and was forced to ask the public defender whether he or she was being released or detained. It was also problematic that the public defender at the detention center often had no access to the child’s court file, and there was absolutely no opportunity to approach the bench to discuss private matters or anything that should not have been openly broadcast. Moreover, perhaps because it was difficult for the children to see, hear, and understand what was taking place, the youth did not behave as those participating in person in a courtroom; that is, the hearings totally lacked the dignity, decorum, and respect one would anticipate in a personal appearance before the court.
Amendment, 796 So.2d at 473. The court also quoted extensively from comments received from two circuit judges who were highly critical of the experience with videoconferencing. Id. at 473-74. The court concluded that “[t]he repealed rule forced the implementation of a predetermined policy representing a mechanistic and robotic approach to matters that require individualized care and attention.” Id. at 474.
Florida’s failed experiment with using videoconferencing to conduct juvenile detention hearings has obvious implications for the use of such equipment in involuntary placement hearings. The court’s in *166 dictment of the use of videoconferencing for Florida’s vulnerable juvenile population is equally applicable to hearings involving persons dealing with mental health issues. The technical problems experienced with the use of the video equipment for juvenile detention hearings will be repeated in Baker Act hearings. Both juveniles and persons with mental health issues may experience problems in expressing themselves in unfamiliar situations and may not fully understand the significance of legal proceedings. For both of these groups, innovations like the use of video equipment that will make their participation in hearings that affect their liberty interest more difficult ought to be avoided. The trial court’s decision to preside over the involuntary placement hearings from a remote location by video disregards the lessons that we should take from the history of Florida’s failed experiment with the use of video equipment for juvenile detention healings.
IV. THE NEED FOR APPROPRIATE AMENDMENTS TO THE RULES
The problems posed by these cases illustrate that our technological capabilities in the area of videoconferencing have outpaced the adoption of court rules necessary to regulate judicial proceedings conducted by video where the judge presides from a remote location. As we go forward, the issue of videoconferencing in judicial proceedings is not likely to be confined to juvenile detention hearings or proceedings for involuntary placements. I anticipate that the next step could involve a situation where a judge residing in or based in one county within a judicial circuit decides to conduct a proceeding remotely by video in another county within the circuit. For example, a judge might decide to conduct a felony trial in Moore Haven remotely from her chambers in Fort Myers. Similarly, another judge might choose to preside over a medical malpractice trial in Wauchula remotely from his chambers in Bartow. I think that most lawyers and judges would conclude that for a judge to preside over such matters remotely by video would be both unfair to the participants and highly inappropriate. But as this case shows, it is not clear under our current law and rules that a judge could not do either of these things. For this reason, I suggest that the Rules of Judicial Administration Committee or other appropriate court rules committees of The Florida Bar should prepare and submit to the Florida Supreme Court proposed rules that address the question of what types of proceedings judges may preside over remotely by video and what proceedings they may not. Appropriate amendments to our court rules to bring them up to date with our technological capabilities are long overdue.

. In the cases involving the individual petitioners, the Public Defender has filed a written objection "to the usage of video remote to conduct Baker Act Hearings and Trials and ... requested[ed] that the presiding officer conduct and attend the hearings in person at the facility.” The trial court has entered written orders overruling these objections.

. It appears from our record that the chief judge of the circuit was aware of the proposed change in procedure.

. The parties have not addressed this issue in their filings in this court.

. A detailed review of these difficulties is beyond the scope of this opinion. However, the problems experienced when judicial proceedings are conducted by video have been studied and discussed in numerous articles. See, e.g., Gerald G. Ashdown & Michael A. Menzel, The Convenience of the Guillotine?: Video Proceedings in Federal Prosecutions, 80 Denv. U. L. Rev. 63, 67-69 (2002); Edie Fortuna Cimino, et al., Charm City Televised & Dehumanized: How CCTV Bail Reviews Violate Due Process, 45 U. Balt. L.F. 56, 70-73 (2014); Anne Bowen Poulin, Criminal Justice and Videoconferencing Technology: The Remote Defendant, 78 Tul. L. Rev. 1089, 1104-41 (2004); Lorne Sossin & Zimra Yetnikoff, I Can See Clearly Now: Videoconference Hearings and the Legal Limit on How Tribunals Allocate Resources, 25 Windsor Y.B. Access to Just. 247 (2007); Ronnie Thaxton, Injustice Telecast: The Illegal Use of Closed Circuit Television Arraignments and Bail Bond Hearings in Federal Court, 79 Iowa L. Rev. 175, 195-202 (1993); Elizabeth C. Wiggins, What We Know and What We Need to Know About the Effects of Courtroom Technology, 12 Wm. & Mary Bill Rts. J. 731, 736-38 (2004).