In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-17-00319-CR
NO. 09-17-00320-CR

**JAMES RAY HAGGARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Cause No. CR30744 (Counts 1 and 2)**
_____

**MEMORANDUM OPINION**

This case is on remand to our Court from the Texas Court of Criminal Appeals. A jury found James Ray Haggard (Haggard or Appellant) guilty of one count of sexual assault of a child and one count of indecency with a child by contact. *See* Tex. Penal Code Ann. §§ 21.11, 22.011(a)(2).[1] Haggard pleaded "true" to the enhancement paragraphs in the indictment alleging prior felony convictions, and the

[1] We cite the current version of the statutes.

1

trial court sentenced Haggard to twenty-five years of confinement in each count, with the sentences to be served consecutively. Haggard appealed, raising seven issues. This Court affirmed Appellant's convictions in an unpublished opinion issued on May 29, 2019. *Haggard v. State*, Nos. 09-17-00319-CR & 09-17-00320-CR, 2019 Tex. App. LEXIS 4378 (Tex. App.—Beaumont May 29, 2019) (mem. op., not designated for publication) (*Haggard I*).[2]

The Court of Criminal Appeals granted discretionary review and in a 5-1-3 decision, the majority held that the trial court violated the Sixth Amendment's Confrontation Clause when it allowed the sexual assault nurse examiner (SANE) witness to testify via two-way video, and the Court reversed and remanded the case to this Court to reconsider whether the constitutional error was harmless beyond a reasonable doubt. *Haggard v. State*, 612 S.W.3d 318 (Tex. Crim. App. 2020) (*Haggard II*).

The Court of Criminal Appeals found that allowing the SANE witness, Suzanne DeVore, to testify via two-way video under the facts presented violated the Confrontation Clause because allowing DeVore to testify did not further an important public policy, and the reasons given for DeVore to testify by two-way

---

[2] In *Haggard I*, we ruled upon and discussed seven issues raised by Haggard on appeal. We expressly did not decide whether the trial court erred in admitting the testimony of the SANE witness. Rather, we "assumed without deciding that the trial court erred" in allowing the witness to testify remotely via two-way video, and we conducted a harm analysis.

video were insufficient to dispense with face-to-face confrontation. *Id.* at 326-28.

The Court of Criminal Appeals also noted that there was a difference between this case and other cases where courts have allowed such remote testimony by children, witnesses who were too sick to travel, or who were deployed in the armed services.[3] *Id.* at 328 & n.17. The Court also discussed and "clarified the harm analysis for the denial of face-to-face confrontation," and it reversed and remanded the cause to this Court to "reassess whether Haggard was harmed." *Id.* at 329-30.

---

[3] *See, e.g.*, *Harrell v. State*, 709 So. 2d 1364, 1367-72 (Fla. 1998) (permitted two adult victims from Argentina to testify remotely using a two-way video system because they lived in Argentina, beyond the subpoena power of the Court, and because the husband had health problems that prevented him traveling to the United States); *Gonzales v. State*, 818 S.W.2d 756, 764-66 (Tex. Crim. App. 1991) (permitting a ten-year-old murder witness to testify via a two-way closed-circuit system); *Marx v. State*, 987 S.W.2d 577, 578-81 (Tex. Crim. App. 1981) (upholding trial court's ruling permitting a child sexual-assault victim and child witness to testify via a two-way video system because doing so furthered the important policy of protecting children who testify in sexual-abuse cases from significant emotional trauma caused by the defendant's presence); *Lara v. State*, No. 05-17-00467-CR, 2018 Tex. App. LEXIS 5395, at **10-13 (Tex. App.—Dallas July 17, 2018, pet. ref'd) (mem. op., not designated for publication) (permitting a witness to testify remotely because he had a heart attack the night before trial and was in the hospital); *Rivera v. State*, 381 S.W.3d 710, 711 (Tex. App.—Beaumont 2012, pet. ref'd) (permitting crime-scene investigator to testify remotely because he was on active duty in Iraq at the time of trial); *Stevens v. State*, 234 S.W.3d 748, 781 (Tex. App.—Fort Worth 2007, no pet.) (permitting a seventy-five-year-old witness who had been hospitalized several times for "decompensated congestive heart failure, gastrointestinal bleeding, atrial fibrillation, and vascular disease[]" in the year before the trial to testify remotely from Colorado); *Bush v. State*, 193 P.3d 203, 214-16 (Wyo. 2008) (permitting a witness who was hospitalized with congestive heart failure one week before trial to testify remotely from Canada).

Harmful Error Standard

We have been instructed to conduct another harm analysis. *See id.* at 330. The Court of Criminal Appeals stated the standard we must apply in this case:

> A denial of physical, face-to-face confrontation is reviewed for harmless error. *Coy [v. Iowa]*, 487 U.S. [1012,[] 1021[, (1988)]; *see Chapman v. California*, 386 U.S. 18, 23 [] (1967). Constitutional error is harmful unless a reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction. Tex. R. App. P. 44.2(a). The State has the burden, as beneficiary of the error, to prove that the error is harmless beyond a reasonable doubt. *See Deck v. Missouri*, 544 U.S. 622, 635 [] (2005) (quoting *Chapman*, 386 U.S. at 24); *Wall v. State*, 184 S.W.3d 730, 746 n.53 (Tex. Crim. App. 2006). In the context of the denial of physical confrontation, the harm analysis "cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation" because "such an inquiry would obviously involve pure speculation." *Coy*, 487 U.S. at 1021-22. Instead, harm must be determined based on "the remaining evidence."

*Id.* at 328.

As noted by the majority, we "*should* examine the testimony that the witness actually gave when determining whether there is a reasonable likelihood that the error affected the judgment of the jury." *Id*. at 328 n.18. In making this review, we consider "any circumstance apparent in the record that logically informs the harm issue[.]" *Id.* at 329. And we may still consider the factors as outlined in *Van Arsdall*, but the presumption as stated in *Van Arsdall* is not applicable to a "face-to-face" Confrontation Clause violation. *Id*. at 328-29. Further, the Court of Criminal Appeals stated:

4

There is another issue that the court of appeals should have addressed in its analysis but did not: whether evidence admitted through the complained-of witness must also be excluded from the analysis? The issue is important here because, without DeVore to prove-up the chain of custody of the SANE kit and its contents, the highly incriminating DNA evidence would have been inadmissible. We think it must be excluded under *Coy*.

*Id.* at 329-30.

In conducting our analysis, "we must 'calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence.'" *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008) (quoting *Jones v. State*, 119 S.W.3d at 766, 777 (Tex. Crim. App. 2003)). If, in light of the *other evidence*, there is a reasonable likelihood that the error materially affected the jury's deliberations, the error is harmful, and the judgment must be reversed. *Id.; see also Jones*, 119 S.W.3d at 777.

We will not consider whether the jury verdict was supported by the evidence, but rather the likelihood that the constitutional error was a factor that contributed to the jury's verdict. *Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010) (quoting *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)). We may consider the source and nature of the error, to what extent it was emphasized by the State, and the weight the jury may have afforded the erroneously admitted evidence. *Id.* (quoting *Scott*, 227 S.W.3d at 690). If we are unable to satisfy ourselves, to a level of confidence beyond a reasonable doubt, that the error did not contribute to

5

the conviction, we must reverse and order a new trial. *See id*. (quoting *Scott*, 227 S.W.3d at 690-91).

Evidence and Arguments Presented at Trial

Testimony of SANE

DeVore was the second witness at trial,[4] and she testified by live two-way video and explained that she performed the SANE examination at Memorial Hermann Hospital on October 7, 2013. She explained that she wrote down M.W.'s account of what happened and included a summary of her notes in her report, and her report was marked and admitted into evidence as State's Exhibit 4.

According to DeVore's notes, when she interviewed M.W., M.W. was calm and cooperative and made good eye-contact. M.W. told DeVore that Haggard penetrated her vagina, but not her mouth or anus. She also told DeVore she was not sure if Haggard had ejaculated on her. DeVore physically examined M.W. and found no trauma to M.W.'s genital area. She did, however, find a red and blue bruise approximately 1.5 centimeters by 1 centimeter on M.W.'s right breast. According to DeVore's SANE forensic report and her testimony, she took swabs of M.W.'s saliva, vagina, anus, labia majora, labia minora, and right and left breasts, and included

---

[4]The first witness was Peggy Bourgeois, the evidence custodian for the Liberty County Sheriff.

them in the SANE rape kit along with M.W.'s underpants, head hair combings, and comb, and she testified that she then forwarded the kit to the police department.

Testimony of the Victim

M.W., the victim, testified at trial. She was fifteen when the alleged sexual assault occurred, and she was nineteen at the time she testified. She referred to Haggard as "Uncle James," although he is not actually her uncle. According to M.W., she and her family spent a lot of time at his house visiting Haggard's children. M.W. testified that she and her sister were spending the night at Haggard's house, she got into Haggard's bed with him because she did not want to sleep on the floor, and she did not think he would do anything "perverted." At trial, M.W. testified that Haggard showed her pornography, he asked her to take her clothes off, and then he caused her sexual organ to contact or penetrate his mouth, he contacted or penetrated her sexual organ without her consent, he penetrated her sex organ with his finger, he caused her to contact his sex organ, he touched her breast with a part of his body, he touched her genitals with a part of his body, he caused her to touch his genitals, and he caused her to expose her genitals to him. M.W. testified that Haggard's actions were done to make him sexually aroused. M.W. testified that Haggard used a condom during the sexual assault. According to M.W., he stopped when he thought he heard someone approaching the bedroom, he told M.W. to put her clothes on, and he told her not to tell anyone what happened. M.W. testified that she texted her friend

7

that night, she called her boyfriend the next morning, and she told them what had happened.

The morning after the assault, while Haggard was at the doughnut shop, M.W. called her mother crying and asked her mother to pick her up. M.W. testified that about an hour later her aunt picked her up. According to M.W., on the way home she and her aunt discussed what took place to some extent. M.W. testified that her mother bagged up her clothes when she changed clothes. On the following Monday, she went to the hospital for a sexual assault exam and answered questions asked by the nurse who performed the exam, and the nurse completed a report. M.W. testified that she also recalled being interviewed at Bridgehaven on October 15, 2013. The State referenced the SANE report in its direct examination of M.W. and the defense did not object to the report.

On cross-examination, the Defense Attorney asked M.W. about what she told the SANE and cross-examined M.W. about alleged inconsistencies between M.W.'s testimony on direct examination with what it stated in the SANE report, and the defense attorney cross-examined M.W. about what she told the interviewer at Bridgehaven, which was tape recorded. M.W. recalled that she told the SANE that Haggard told M.W. to take off her shirt and M.W. told Haggard she felt uncomfortable. Although the SANE forensic report admitted at trial noted that M.W. reported to the SANE that Haggard pulled her into his bedroom, M.W. testified that

8

she did not remember telling that to the SANE. M.W. recalled that she told the SANE that Haggard took off her shorts and then sexually assaulted her. M.W. testified that she reported to the SANE that Haggard digitally manipulated her breasts and put his mouth on them, that he put his mouth on her sexual organ, and that he penetrated her vagina with his penis. The SANE forensic report noted that M.W. told the SANE that Haggard "cleaned himself off" with M.W.'s shirt, and M.W. testified she recalled telling that to the SANE during the exam. The SANE forensic report indicated that M.W. reported to the SANE that Haggard used a condom and that M.W. showered between the time of the assault and the SANE exam. M.W. recalled that she told the SANE that Haggard heard someone walking down the hall, and Haggard told M.W. to hurry and put her clothes on. M.W. agreed that she told the SANE that Haggard kept telling M.W. that she better not tell because Haggard would "lose his baby and if anyone found out he would go to jail."

Testimony of the Victim's Mother

Tracy, M.W.'s mother, testified that Haggard is her cousin and that she has known Haggard her entire life. According to Tracy, on October 5, 2013, she took her two children, M.W. and A.W., to Haggard's house to play with his stepson and daughter and spend the night, which is something that happened often. Tracy testified that she left around 8 p.m. and two of her children, A.W. and M.W., stayed the night at Haggard's house. Tracy recalled that around 8:30 a.m. the following

9

morning she received a phone call from M.W., who sounded distressed. After they spoke, Tracy "took a minute to kind of grasp . . . what [M.W.] had told [her,] and then Tracy called Linda, her brother's ex-wife and one of her closest friends, and M.W.'s aunt, to ride with her to pick M.W. up. Tracy explained that M.W. was distressed and kept calling and asking her to hurry up, so she had Linda pick M.W. up instead because Linda lived closer and could get there faster.

According to Tracy, Linda brought M.W. back to Tracy's house and M.W. then told them what had happened. Tracy explained that she walked in and out of the room because she did not want to hear the details, and she "just heard bits and pieces of it[.]" Tracy testified that she believed M.W., Tracy was hurt and angry and that what she heard had "changed everything[,]" and that Haggard was "like a brother to [her]." Later that evening they left for her niece's birthday party because plans had already been made and Tracy did not know yet how to handle the news of the assault. Before they left for the party, M.W. showered and Tracy had M.W. put the clothes M.W. had worn at Haggard's house in a "zip lock bag[]" because "[M.W.] had said that there was stuff on the clothing[.]" According to Tracy, Linda picked M.W. up from school the next morning and took her to the hospital. Tracy met them at the hospital later after she had arranged with her boss to leave work. Hospital personnel notified law enforcement and Tracy provided law enforcement with her written statement.

<u>Testimony of the Aunt</u>

Linda testified that she previously had been married to Tracy's brother, and after the divorce, Linda remained friends with Tracy. Linda had known M.W. since M.W.'s birth, and M.W. referred to Linda as her "aunt[.]" According to Linda, on October 6, 2013, she had a phone call with Tracy, and Linda picked M.W. up from Haggard's house. Linda explained that she had been to Haggard's house before and that when she picked up M.W., M.W. stepped out on the porch as Linda pulled up, and then Linda walked into Haggard's house. According to Linda she was at Haggard's house for approximately four or five minutes, she spoke to Haggard, and his demeanor "seemed normal."

According to Linda, she picked up M.W. and A.W., and on the way to Tracy's house, M.W. seemed quieter than usual. Linda testified that M.W. recited the events that had taken place at Haggard's house several times to her and to Tracy, and that although the basis of the account did not change, the account became more detailed. Linda testified that she saw a mark on M.W.'s breast that was consistent with her having been assaulted. After several hours, Linda left to allow M.W.'s parents to decide how to proceed. Linda indicated that Tracy was struggling with how to proceed because of the potentially "devastating" impact to the family, and Tracy was "really scared, really upset, really lost." Linda explained that at the time of the incident she was working in a sex offender rehabilitation program in the prison, that

11

she called a rape crisis center to get information on what she should do because she felt like M.W. needed to go to a doctor and be examined. Later that day she called Tracy and told her she was going to pick up M.W. and take her to the hospital, Tracy was agreeable to that, and Linda took M.W. to the hospital. According to Linda, M.W. was nervous and scared on the way to the hospital and "[s]he cried quite a bit that day." Linda testified that she gave the clothes that M.W. had been wearing on the day of the assault to hospital personnel. Tracy arrived at the hospital later.

Testimony of Detective Clappart

Detective Stephen Clappart, the chief investigator for the Harris County District Attorney's Office, testified that he observed via closed circuit television the forensic interview of M.W. at Bridgehaven. Detective Clappart testified that he noted in his report that the account of events that M.W. gave to the SANE was slightly different from what she gave to the Bridgehaven examiner in that she reported to one of the examiners that Haggard had pulled her into the bedroom, but she did not report that to the other examiner. According to Detective Clappart, he collected buccal swabs from Haggard.

Testimony of Jessica Lake and Andrea Smith

Jessica Lake, a forensic scientist at the Texas Department of Public Safety crime lab, testified that she performed serology testing on evidence she had received which included the buccal swabs obtained from Haggard and the contents of the

SANE kit. The SANE kit contained vaginal swabs, labia majora swabs, labia minora swabs, anal swabs, swabs taken from M.W.'s breasts, head-hair combings, underpants, a bra, a sports bra, and a shirt. Lake did not find any semen on the vaginal swabs, labial swabs, or anal swabs. Lake found areas of interest on the underpants and shirt that she tested, but both tests were negative for the presence of semen. Lake's Forensic Biology Laboratory Report was admitted into evidence.

Andrea Smith, Lake's supervisor, testified that she works on the same team as Lake and completed the DNA testing in the case. Smith prepared three reports, one in 2015 and two in 2017. Smith's DNA Laboratory Report, Supplemental DNA Laboratory Report, and Minifiler Laboratory Report were admitted into evidence as State's Exhibits 7, 8, and 9. According to Smith, the DNA profile from the vaginal swab was consistent with M.W.'s DNA. Smith found a single DNA profile consistent with M.W. on the vaginal, labia majora, and labia minora swabs. Testing of the left-breast swab was inconclusive, but a partial DNA profile was extracted from the right-breast swab. The partial profile was consistent with a two-person mixture, from which neither M.W. nor Haggard could be excluded as contributors. In 2017, Smith reinterpreted the DNA data using new testing guidelines and software. She found that it was 339 billion times more likely that M.W. and Haggard

contributed to the mixed DNA on the right-breast swab than M.W. and some other unknown and unrelated individual.[5]

Analysis

We must determine harm based on "the remaining evidence." *Haggard II*, 612 S.W.3d at 628. We must determine whether in light of the *other evidence*, there is a reasonable likelihood that the admission of the SANE testimony, as well as the admission of the SANE kit, and the DNA evidence, materially affected the jury's verdict. *Neal*, 256 S.W.3d at 284; *Jones*, 119 S.W.3d at 777. According to the Court of Criminal Appeals, "without Devore to prove-up the chain of custody of the SANE kit and its contents, the highly incriminating DNA evidence would have been inadmissible." *Haggard II,* 612 S.W.3d at 329-30.

The prosecutor argued to the trial court before trial that Devore was an expert witness and SANE examiner, and that her testimony was important because she "collected the SANE kit and submitted the SANE kit to the sheriff's department to put in the chain of custody to send it to the DPS lab along with everything else." The swab DeVore collected from the victim's right breast was the only swab that showed a mixture of DNA from the victim and Haggard, and Smith's testimony and

---

[5] The prosecutor told the jury during opening statement and summation that the DNA expert concluded that appellant's DNA was found on the complainant's right breast. This evidence was also described by the State as "the strongest and the most definitive piece of evidence we have got in this case."

additional analysis performed on that swab showed that "[o]btaining this profile is 339 billion times more likely if the DNA came from [M.W.] and James Haggard than if the DNA came from [M.W.] and one unrelated unknown individual." The State placed great emphasis on the testimony of DeVore in introducing the chain-of-custody for the DNA swabs and in arguing to the jury that Haggard assaulted M.W. That said, the defense attorney also placed strong emphasis at trial on the other DNA swabs collected by DeVore, as well as on the contents of DeVore's SANE report, and defense argued that there was an absence of Haggard's DNA on any of the other swabs collected by DeVore. The defense also argued that the victim's initial account of using her shirt to wipe off Haggard's bodily fluids was proven to be false because the analysis of the clothing also came back negative. Setting aside the testimony from the SANE and the DNA evidence and testimony pertaining thereto, the remaining evidence consisted of:

    a. testimony from the victim, which included details of the sexual assault, as well as direct examination and cross-examination about what the victim told the SANE, and what the victim told the Bridgehaven interviewer, and details regarding alleged inconsistencies in her testimony.

    b. testimony from the victim's mother and testimony from the victim's aunt.

c. testimony from the officer that observed the Bridgehaven interview, and testimony from the evidence clerk who boxed up the evidence and sent it to the crime lab for DNA testing.

After examining the "remaining evidence," and then considering the emphasis that the State placed on the importance of the SANE to prove up the chain of custody and the importance the State placed on the DNA evidence obtained from the victim's right breast showing a mixture of Haggard's DNA with the victim's DNA, we are unable to satisfy ourselves, to a level of confidence beyond a reasonable doubt, that the testimony from the SANE, as well as the contents of the SANE kit, the swabs taken from the breasts of the victim, and the DNA evidence collected by the SANE, did not move "the jury from a state of non-persuasion to one of persuasion," and we cannot say that the error did not contribute to the conviction. *See Langham*, 305 S.W.3d at 582 (quoting *Scott*, 227 S.W.3d at 690). We conclude that after reviewing the record before us that the State failed to meet its burden of establishing from the other evidence that the error was harmless beyond a reasonable doubt. *See Haggard II*, 612 S.W.3d at 328. Therefore, we reverse and order a new trial.

REVERSED AND REMANDED.

_____
LEANNE JOHNSON
Justice

16

Submitted on May 13, 2021
Opinion Delivered June 23, 2021
Do Not Publish

Before Kreger, Horton and Johnson, JJ.