DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**E.A.C.,** a Child,
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D20-2079

[June 30, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Kathleen J. Kroll, Judge; L.T. Case No. 50-2020-CJ-000147-XXXX-MB.

Carey Haughwout, Public Defender, and Erika Follmer, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Rachael Kaiman, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The delicate balancing act between due process and public health is at the forefront of this appeal. A juvenile ("E.A.C.") appeals a finding of guilt and disposition on an attempted robbery charge. He argues the trial court erred in failing to conduct a *Maryland v. Craig*[1] analysis before allowing witnesses to testify remotely at his non-jury trial. He also argues error in the trial court's: (1) limiting cross-examination of the victim; (2) permitting the victim to speculate in his testimony; and (3) denying the defense motion for judgment of dismissal. We disagree and affirm.

Prior to the start of the pandemic, the State filed a petition for delinquency alleging E.A.C. attempted to commit robbery.

### *The Administrative Orders*

---

[1] 497 U.S. 836 (1990).

In March 2020, the pandemic caused global shutdowns of government and business. In the same month, our supreme court began issuing administrative orders to address judicial proceedings due to the pandemic. In Amendment 5 to Florida Administrative Order AOSC20-23 (April 6, 2020), the supreme court ordered that "[a]ll rules of procedure, court orders, and opinions applicable to court proceedings that limit or prohibit the use of communication equipment for the remote conduct of proceedings **shall remain suspended**." *In re* Comprehensive COVID-19 Emergency Measures for the Florida State Courts, Fla. Admin. Order AOSC20-23, Amend. 5 (July 2, 2020), https://www.floridasupremecourt.org/content/download/639134/file/AOSC20-23-Amendment-5.pdf (emphasis added).

The amendment further directed that "[n]on-jury trials in . . . juvenile delinquency cases shall be conducted remotely if ordered by the chief judge or the presiding judge or, if not, shall be conducted in person." *Id.*[2] On June 30, 2020, the Chief Judge of the Fifteenth Judicial Circuit issued an administrative order directing that non-essential proceedings such as hearings in juvenile delinquency cases "will be held remotely and **may not** proceed in-person until further order of the Court." *In re* Mitigating Measures in Response to COVID-19, Fla. 15th Cir. Ct. Admin. Order 12.510-06/2020.12*, https://www.palmbeachbar.org/wp-content/uploads/2020/06/SKM_C450i20063015100.pdf (emphasis added).

### *Pre-Trial Decisions*

Prior to trial, E.A.C. filed an "Objection to Witnesses Appearing by Zoom or Other Remote Means," in which he relied on his constitutional right to due process and confront witnesses. At the hearing on his objection, defense counsel advised the court that the alleged victim and four of the listed witnesses were minors. Counsel explained that he had difficulty controlling the environment when minors testified on screen and that it was more difficult "to impart the seriousness of what's going on when it is being handled remotely."

He also shared his concern about the "shared screen feature" and his ability to impeach the witnesses. He explained that he was not sure "if the fact finder would be able to see the reaction of the person being impeached

---

[2] On July 17, 2020, we denied a petition for writ of prohibition where another juvenile sought to prevent her delinquency trial from moving forward in Zoom format. Order, *L.A. v. State*, No. 4D20-1566 (Fla. 4th DCA Jul. 17, 2020). We cited the provisions of the administrative order. *Id.*

if the screen is shared." He then provided an anecdote of a child, who asked "when do we see the judge," after the child had just concluded her remote detention hearing.

The trial court responded that techniques had been developed to address defense counsel's concerns. The court stated: "I think everybody's just worried at how long [the shutdown] is going to take and they don't want to delay these things unless absolutely necessary," and "I will address every concern you've raised at the time it becomes an issue."

E.A.C. also moved for special instructions to be read to witnesses appearing remotely.[3] The trial court agreed to read the first four instructions but declined to read the fifth and sixth.

---

[3] The requested instructions were:

> 1. A basic rule is that a witness's testimony is to be based on their own personal knowledge and recollection. Do you understand that you are not to look at any other materials or talk to anyone else in person or otherwise while testifying?
>
> 2. I want to stress that this rule means you must not use electronic devices or cell phones during testimony other than for the purposes of accessing the court hearing.
>
> 3. You must not do any research or look up words, names, maps, or anything else that may have anything to do with this case. This includes reading newspapers, watching television or using a computer, cell phone, the Internet, any electronic device, or any other means at all, to get information related to this case or the people and places involved in this case.
>
> 4. [F]o[r] the purpose of ensuring the integrity of your testimony, I am going to ask the following questions:
>
> a. Where are you calling in from?
> b. Is there anyone else in the room with you today?
> c. Do you agree that if anyone enters the room during your testimony, that you are to inform the Court?
> d. Do you agree that you are not to use any electronic devices during your testimony other than to access this hearing?
>
> 5. You have also just taken an oath on this case to tell the truth, which subjects you to perjury. Do you understand that if you make a false statement, which you do not believe to be true, under oath in an official proceeding in regard to any material matter, you

### *The Non-Jury Trial*

The court conducted the non-jury trial on August 14, 2020 in the middle of the pandemic. The juvenile appeared in the courtroom with the attorneys and judge. The witnesses appeared via Zoom.

The trial court told each witness: (1) the proceeding was being held on Zoom due to Covid-19 precautions; and (2) the proceeding was to be treated as if the witness were in the courtroom, and all the rights and responsibilities were the same. Each witness was "duly sworn," and each confirmed to the judge that he or she understood that: (a) their testimony must be based on personal knowledge; (b) they would not look at materials or talk to anyone else while testifying; and (c) they would not use any electronic device or conduct any research during the testimony. Each witness answered the questions defense counsel requested in his Motion for Special Instructions.

In its opening statement, the State told the court that the victim was known to carry vape pens, large sums of cash, and other valuables on his person. He was wearing his Apple AirPods on the day of the incident. E.A.C. and "a number of other students" entered a high school restroom, cornered the victim, and repeatedly struck him while attempting to obtain his possessions.

A teacher testified that he became aware of the disturbance in the restroom, which was located about twenty feet from his classroom. As he approached the restroom, he saw E.A.C. and others exiting the restroom. Some of them were "standing about and filming."

The court then asked the teacher if he could see everyone on the screen. He responded that he just saw the prosecutor. He was instructed to switch to gallery mode. He then confirmed he could see "everybody," including E.A.C., and identified his clothing, as well as the name of the person sitting next to him.

---

commit a felony and can be incarcerated to up to five years in prison?

6. And do you agree that if the State pursues charges, that you will submit to the jurisdiction of the State of Florida and turn yourself in to the authorities?

When the teacher entered the restroom, the victim was seated on the floor up against a wall in a stall; he looked disheveled. The teacher instructed him to stay there while he found someone. The teacher found the assistant principal ("AP") and told her what happened. The teacher returned to the bathroom to check on the victim, but he was gone.

The victim testified he knew E.A.C. as a kid in his gym class. The victim confirmed that he could see E.A.C. on his screen. Around 8:30 in the morning, the victim was walking out of the bathroom when he saw E.A.C. and three other guys. They started pushing him toward the back of the bathroom.

When describing the incident, the victim explained, "they kept like trying to hit me and kick me or whatever. And then I just put my hands in my pockets. That way, they wouldn't be able to grab anything." Specifically, E.A.C. "kept trying to reach into [the victim's] pockets" and "kept trying to strike [him] in the face."

The State showed the victim a fifteen-second video of the incident over Zoom. The victim identified himself as "the one on the ground" and E.A.C. as wearing a black and white hoodie. The video showed E.A.C. hitting the victim's face. The victim told the boys that someone else had his stuff.

In the video, E.A.C. appeared to be the most aggressive. He succeeded in getting into the victim's pockets and tried to pull out his AirPods or the case, but the victim pushed his hand away. Nothing was taken from the victim, but he sustained some small scrapes and bruises.

The victim then found two school IDs near him, one belonged to E.A.C. Immediately after the incident, the victim went to class. He was later called to the principal's office, and eventually to the AP's office. He identified those involved and was shown pictures to verify their identities. The victim provided the school police with a written statement, but it did not include E.A.C.'s name.

The State next called J.P., who confirmed he could see E.A.C. on his screen and identified him by his clothing.[4] The State charged J.P. in the incident. He entered a guilty plea and was placed on probation. As a condition of probation, he agreed to testify against E.A.C.

---

[4] The trial court spent several minutes virtually assisting J.P. to set up gallery mode on his Zoom.

J.P. testified that he, E.A.C., and two other boys planned to jump the victim in the school bathroom. J.P. watched while another boy filmed the incident. J.P. gave a written statement to police in which he denied any physical contact with the victim. He did not see anyone try to take the victim's things. J.P. heard it was just going to be some "slap boxing" in the bathroom, which is "a playful kinda fighting."

The defense moved for a judgment of dismissal. Defense counsel argued the petition alleged that E.A.C. completed a taking but failed to take anything. He further argued that any intent to take something from the victim was based on speculation. Because J.P.'s testimony did not establish a plan, defense counsel argued the State failed to prove an attempted robbery. The court denied the motion.

In closing, E.A.C. argued the State only proved a battery and the video did not show E.A.C. reaching into the victim's pockets. He further argued the victim had good reason to lie, which was evidenced by his statement that someone else had his property and by the victim leaving the bathroom before the teacher returned. He called J.P.'s credibility into question based on his agreement to testify.

The trial court found E.A.C. guilty as charged, withheld adjudication, and placed him on probation until he turned nineteen. E.A.C. now appeals.

### *The Analysis*

"[M]ixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue." *Davis v. State*, 142 So. 3d 867, 871 (Fla. 2014) (alteration in original) (quoting *Henry v. State*, 134 So. 3d 938, 946 (Fla. 2014)).

On appeal, E.A.C. argues the trial court violated his due process and confrontation rights by conducting his non-jury trial via Zoom. The State responds that E.A.C.'s constitutional rights were protected when the trial court complied with the administrative orders from our supreme court and its circuit and insured the integrity of the non-jury trial through its instructions to the witnesses. We agree with the State and affirm.

E.A.C. first argues he had a due process right to counsel, to confront and cross-examine witnesses, and to be physically present at his trial. We agree. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the

accused shall enjoy the right to . . . be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."). E.A.C. was physically present at his trial alongside his counsel, the prosecutor, and the trial judge. His attorney had the opportunity to cross-examine witnesses, although due to the pandemic, those witnesses appeared by Zoom.

E.A.C. next argues his right to confront witnesses was violated because the witnesses appeared by Zoom. We disagree.

We start from the premise that *Craig* sets the standard and articulates the analysis for determining the unique issue of when child victims of sexual abuse may appear by closed circuit television. 497 U.S. at 850–60. It did not address Zoom appearances in non-jury trials during a pandemic.

In addressing that unique issue, the Court wrote: "We have never held . . . that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." *Id.* at 844 (emphasis added). Indeed, "the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities [such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (per curiam). "[T]he word 'confronted,' as used in the Confrontation Clause, cannot simply mean face-to-face confrontation, for the Clause would then, contrary to our cases, prohibit the admission of any accusatory hearsay statement made by an absent declarant—a declarant who is undoubtedly as much a 'witness against' a defendant as one who actually testifies at trial." *Craig*, 497 U.S. at 849.

The Court then acknowledged that denial of physical, face-to-face confrontation may occur when it "is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850. The Court indicated that the critical inquiry "is whether use of the procedure is necessary to further an important state interest." *Id.* at 852. The Court then indicated that if the trial court makes a "case-specific finding of necessity," the Confrontation Clause does not prohibit the use of one-way closed-circuit television for child witness testimony in a child abuse case. *Id.* at 860.

But significantly, nothing in *Craig* addressed how the standard should be applied when not only the jurisdiction, but the world, is in the middle

of a pandemic. Indeed, none of the cases relied upon by the dissent were written during a pandemic. And, but for the pandemic, the dissent might be correct. The problem is this trial took place in a pandemic where all the rules of the game changed.

We would almost be writing on a clean slate were it not for the thoughtfully written opinion of the Third District in *Clarington v. State*, 314 So. 3d 495 (Fla. 3d DCA 2020). There, the defendant filed a petition for writ of prohibition seeking "to prohibit the trial court from conducting a remote probation violation hearing." *Id.* at 497. The participants appeared from separate locations. *Id.* at 498. Even the defendant was located apart from counsel. *Id.* The Third District denied the petition, reasoning:

> In light of the COVID-19 pandemic and the resulting public health emergency, the Florida Supreme Court issued several administrative orders (and amendments thereto) in an effort to provide temporary guidelines, benchmarks and requirements for the continuity of operations within the trial and appellate courts. *See e.g.*, AOSC20-23, AOSC20-32, outlining distinct phases and requirements for court operations and establishing benchmarks which must be satisfied before a court may move into the next phase of court operations.

*Id.* at 500 (footnote omitted).

The Third District held the trial court's order directing the probation violation hearing be conducted remotely "[did] not violate Clarington's rights to confrontation and due process." *Id.* at 509; *see also Vazquez Diaz v. Commonwealth*, 167 N.E.3d 822, 837, 838 (Mass. May 5, 2021) (holding trial court erred in denying continuance of suppression hearing, but concluding "a virtual evidentiary hearing on a motion to suppress is not a per se violation of the defendant's right to confrontation under art. 12 in the midst of the COVID-19 pandemic" and "may be necessary to further the important public policy of protecting the public health from COVID-19").

*Clarington*'s analysis is applicable here, even though it dealt with a probation violation hearing.

> The concept of due process is not rigid or static, but flexible and dynamic." As the United States Supreme Court observed in *Morrissey v. Brewer*, 408 U.S. 471, 481 [] (1972), "due process is flexible and calls for such procedural protections as

8

the particular situation demands." *See also Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610 [] (1974) (noting: "The requirements of due process of law 'are not technical, nor is any particular form of procedure necessary.' Due process of law guarantees 'no particular form of procedure; it protects substantial rights.' 'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'") (citations omitted); *Caple v. Tuttle's Design-Build, Inc.*, 753 So. 2d 49, 51 (2000) (recognizing: "It has long been established that flexibility is a concept fundamental to a determination of the adequacy of a statute's due process protections. . . . Furthermore, rather than articulating a laundry list of specific procedures required to protect due process, the United States Supreme Court has emphasized that the protection of due process rights requires balancing the interests of the parties involved.") (citations omitted). Whether a proceeding comports with fundamental principles of due process depends on, and is informed by, the attendant circumstances and a balancing of the competing interests at stake.

*Clarington*, 314 So. 3d at 501.

In applying these concepts to this non-jury delinquency proceeding, we must acknowledge that while juveniles are provided many of the protections afforded to adults in criminal proceedings, they are not afforded the same panoply of rights. *See P.W.G. v. State*, 682 So. 2d 1203, 1207 (Fla. 1st DCA 1996). Perhaps most importantly, this juvenile proceeding took place during a global pandemic which has spawned a public health emergency throughout the world and at a time where the infection and death toll in the area of the trial was at one of its highest.[5]

The Florida Supreme Court's administrative orders [were] crafted in an effort to strike the proper balance between the

---

[5] By late August, Florida's infection rate had topped 600,000, including Palm Beach County's 40,570 infected. *See* Chris Persaud, *Florida's Coronavirus Cases Top 600,000,* THE PALM BEACH POST (Aug. 23, 2020, 1:32 PM), http://www.palmbeachpost.com/story/news/coronavirus/2020/08/23/florida rsquos-coronavirus-cases-top-600000/42282457/). At the time of trial, Florida had seen approximately 10,717 coronavirus-related deaths and 37,038 hospitalizations. *See* Andrea Torres, *Coronavirus: Florida Records 2,763 New Cases, 183 More Deaths,* Local10 (Aug. 26, 2020, 5:43 PM), https://www.local10.com/news/local/2020/08/25/coronavirus-florida-records-2673-new-cases-183-more-deaths/.

competing interests of ensuring the health and safety of all those entering the courthouse; expeditiously and properly adjudicating criminal cases consistent with our obligation as a branch, especially those cases in which the accused remains in custody; and preserving those fundamental due process rights afforded to an accused.

*Clarington*, 314 So. 3d at 502.

"[E]ven in the context of a criminal trial, a defendant's Sixth Amendment right to physically confront a witness face-to-face is not absolute." *Id.* at 504. "Instead, it is subject to an analysis undertaken in light of the circumstances presented, balancing the competing interests, public policy or necessities of the case." *Id.* at 504–05 (citing examples).

Here, E.A.C. submitted a written objection to the remote hearing; the State filed a written response. At the pretrial conference, the State advised that all witnesses would be appearing by Zoom. Defense counsel stated his main concern was that the minor witnesses would not treat remote proceedings as seriously and it was harder to control what went on with them. Defense counsel was also concerned about parental interference with testimony and the court's ability to see a witness's demeanor.

The trial court responded that it had learned "techniques" to address those concerns and overruled the defense objections. The court pledged to "address every concern you've raised at the time it becomes an issue." The trial court recognized that no one knew how long the restrictions would last and people did not want to delay proceedings "unless absolutely necessary."

The trial court painstakingly took great care to read four of the six instructions requested by the defense and advised the witnesses of the seriousness of their testimony. The court insured the witnesses were on "gallery" view. In short, the trial court provided the necessary protection of E.A.C.'s due process and confrontation rights. *See, e.g., In the Interest of R.J.B.*, 482 P. 3d 519 (Colo. App. 2021) (holding Web-X hearing on termination of parental rights did not violate the mother's due process or equal protection rights).

And significantly, E.A.C. did not cite to any issue related to the witness' testimony and the remote proceedings during the non-jury trial. Rather, the parade of concerns raised on appeal relate to **potential** problems in a remote proceeding, not to any problems that occurred here.

We recognize the distinctions between the probation violation hearing in *Clarington* and the juvenile non-jury trial here. But we hold the remote non-jury trial did not violate E.A.C.'s due process or confrontation rights under the pandemic circumstances that existed in August 2020. And, unlike the defendant in *Clarington*, E.A.C. was able to be in the same room as his counsel, the prosecutor, and the judge.

The Third District's concluding remarks apply equally here.

> We conclude that the proceeding proposed by the trial court in this case appropriately considered these necessities and competing interests, balancing the defendant's constitutional rights and the responsibility of the judicial system to hear, adjudicate and dispose of criminal matters and conduct criminal proceedings, through the application of temporary procedures needed to ensure the health and safety of those participating.

*Clarington*, 314 So. 3d at 509. The court system cannot be a legal ostrich and stick its head in the sand to avoid the obvious—the COVID pandemic.

We affirm the remaining issues without further discussion.

*Affirmed.*

LEVINE, C.J., concurs specially with opinion.
CIKLIN, J., dissents with opinion.

LEVINE, C.J., specially concurring.

I agree that this case should be affirmed, but I write to explain the limited circumstances where the specific necessity of waiving "face-to-face" confrontation of witnesses by the defendant is satisfied by the procedure used in this case during this trial held on August 14, 2020.

In August 2020 it was clear that we were in the throes of the pandemic.[6] The vaccines that are presently widely and readily available were in Phase 3 trials and not available to the public.[7] The Florida Supreme Court had

---

[6] On August 14, 2020, there were 228 deaths reported in Florida and 1,143 deaths nationwide. https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases.

[7] https://www.wsj.com/articles/modernas-coronavirus-vaccine-begins-final-stage-testing-11595854440.

issued administrative orders allowing juvenile delinquency cases to be "conducted remotely if ordered by the chief judge or the presiding judge . . . ." Fla. Admin. Order No. AOSC20-23 Amendment 13 (July 2, 2020) (on file with clerk, Fla. Sup. Ct.). At the time of the trial, the circuit court was under "Phase 1" of the administrative order, and the Chief Judge of the circuit court ordered that juvenile delinquency cases "will be held remotely and may not proceed in-person until further order of the Court." Fla. Admin. Order No. 12.510-05/2020.11* (May 27, 2020) (on file with Clerk, Fla. 15th Cir. Ct.). The Fifteenth Circuit did not even enter Phase 2 until September 9, after the completion of this trial.[8]

The seriousness of the situation was not in doubt. No one questions the sincerity of the actions of all those in the judiciary who attempted to safeguard the safety of all those who participate in the court system. To have an "in person" trial in August 2020 could have, in theory, potentially placed many more at risk at that time, including the witnesses who were eventually allowed to testify remotely.

One of the key procedural safeguards within a trial is the right of the accused to confront witnesses face-to-face. *See Coy v. Iowa*, 487 U.S. 1012, 1017-20 (1988) (noting that face-to-face confrontation is "essential to a fair trial" and serves to "ensur[e] the integrity of the fact-finding process") (citations omitted).

In *Maryland v. Craig*, 497 U.S. 836 (1990), the United States Supreme Court required that the trial court make a finding of necessity, on a case-by-case basis, for the use of a one-way closed-circuit camera in lieu of a face-to-face confrontation. Although the preferred procedure in the present case would have been for the trial court to at least attempt to make some type of a "case-specific finding" allowing for the questioning of witnesses by Zoom[9], there was clearly sufficient necessity that existed in August 2020 for the trial court to proceed with the procedure used. Further, what specific finding could the trial court have made? Being in the midst of a pandemic, all of the witnesses were in the same situation. Additionally, the situation in that courtroom was the same situation in every courtroom in the state. The pandemic existed, and there was no vaccine available at the time. It seems futile to require a "case-specific finding" in one courtroom that would mirror the situation throughout the state, and potentially the country.

---

[8] https://www.15thcircuit.com/covid-updates.
[9] Zoom is a cloud-based communications application for virtual video conferencing.

Significantly, where justified by the circumstances, courts have allowed the remote confrontation of witnesses, even in cases with less severe circumstances than a pandemic. *See Harrell v. State*, 709 So. 2d 1364 (Fla. 1998) (allowing foreign witnesses to testify remotely because they were beyond the subpoena power of the court, one witness was in poor health and could not travel, and they were essential to the case); *Butler v. State*, 254 So. 3d 651 (Fla. 4th DCA 2018) (allowing foreign witness to testify remotely based on the state's interest in prosecuting the case, the importance of the witness's testimony, the fact that the witness could not be compelled to testify, and uncertainty in her ability to obtain a return visa); *Rogers v. State*, 40 So. 3d 888, 889 (Fla. 5th DCA 2010) (allowing arresting officer to testify remotely from China where he resided because his testimony was necessary to prosecute the case and "there was an effective procedure in place to enforce a U.S. warrant for the crime of perjury for a U.S. citizen residing in China"); *Lima v. State*, 732 So. 2d 1173 (Fla. 3d DCA 1999) (allowing out-of-state victim to testify remotely where travel would cause discomfort and childcare issues); *Clarington v. State*, 314 So. 3d 495, 501 (Fla. 3d DCA 2020) (permitting a probation violation hearing to be conducted remotely "in light of the nature of a probation violation hearing and the circumstances posed by the current public health emergency").

Still, it is also important to remember that there is no pandemic exception to the Constitution. Although the pandemic persists, so does the Constitution. *Terkel v. Ctrs. for Disease Control & Prevention*, No. 6:20-cv-00564, 2021 WL 742877, at *10 (E.D. Tex. Feb. 25, 2021). We as a country have faced other challenges with our Constitution intact and in force, such as war, terrorism, and now, a pandemic. "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan*, 71 U.S. 2, 120-21 (1866).

I also share the dissent's fidelity to the Constitution, but the words of Justice Robert Jackson have special resonance today as we consider application of the Constitution in the midst of the pandemic. "The choice is not between order and liberty. It is between liberty with order and anarchy without either. There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact." *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (Jackson, J., dissenting). The trial court conducted the trial by utilizing the type of "practical wisdom" required for these extraordinary circumstances.

13

This opinion should not be construed as a license in the future to avoid the strictures of witness confrontation as set forth in *Maryland v. Craig.* There should be a clear correlation between the existence and severity of the exigency and the latitude given to the trial court. The longer the exigency lasts, however, the more demanding we should be in allowing that accommodation to continue. The reason for this is clear. As Justice Felix Frankfurter noted many years ago, "The history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U.S. 332, 347 (1943). As the exigency recedes, so should any allowance of any emergency accommodation.

Therefore, based on the limited circumstances of this specific case, I would affirm.

CIKLIN, J., dissenting.

> *The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism . . . .*

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 120-21 (1866).

I dissent. The child's constitutional right to confront witnesses was violated when the trial court permitted witnesses to testify remotely without first making the individualized findings required by *Maryland v. Craig*, 497 U.S. 836 (1990). By permitting this to occur, the trial court (and now the majority) have acquiesced to the abrogation of E.A.C.'s fundamental constitutional rights.

## I. Analysis

The Sixth Amendment of the United States Constitution affords defendants in a criminal prosecution "the right . . . to be confronted with the witnesses against him," among other rights. Juveniles are not afforded the same full panoply of due process rights as adult criminal defendants, nor are their proceedings the same, *In Interest of C.J.W.*, 377 So. 2d 22, 24 (Fla. 1979), but they still enjoy rights under the Confrontation Clause of the Sixth Amendment, *see, e.g., M.C. v. State*, 516 So. 2d 1076, 1077 (Fla. 2d DCA 1987) (holding juvenile was deprived of right to confrontation and

cross-examination when trial court conducted adjudicatory hearing in her absence).

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845. "[T]he right guaranteed by the Confrontation Clause includes not only a 'personal examination,' but also '(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.'" *Id.* at 845-46 (second alteration in original) (internal citation omitted) (quoting *Mattox v. United States*, 156 U.S. 237, 242 (1895); *California v. Green*, 399 U.S. 149, 158 (1970)).

Generally, "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *See Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (holding that sexual assault defendant's confrontation rights were violated when a screen was placed between him and the two complaining witnesses at trial). As discussed in *Coy*, a face-to-face encounter inspires a speaker's veracity in an unparalleled fashion:

> The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it. A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is." Z. Chafee, The Blessings of Liberty 35 (1956), quoted in *Jay v. Boyd*, 351 U.S. 345, 375–376, 76 S.Ct. 919, 935–936, 100 L.Ed. 1242 (1956) (Douglas, J., dissenting). It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly. The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions.

*Coy*, 487 U.S. at 1019.

Even though "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," such a confrontation is not indispensable. *Craig*, 497 U.S. at 849-50 (emphasis in original) (citation omitted). In *Craig*, the United States Supreme Court set forth the following test for whether the absence of face-to-face confrontation is constitutionally satisfactory: "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is *necessary* to further *an important public policy* and only where *the reliability of the testimony* is otherwise assured." *Id.* at 850 (emphasis added). Face-to-face confrontation "may be abridged only where there is a *case-specific finding of necessity.*" *Id.* at 857-58 (emphasis added) (citations and quotation marks omitted) (approving Maryland's statutory procedure of using a one-way closed circuit television to examine a child witness); *see also Harrell v. State*, 709 So. 2d 1364, 1369 (Fla. 1998) (citing *Craig* and explaining that "[i]n order to qualify as an exception, the procedure must (1) be justified, *on a case-specific finding*, based on important state interests, public policies, or necessities of the case and (2) must satisfy the other three elements of confrontation—oath, cross-examination, and observation of the witness's demeanor" (emphasis added)).

In *United States v. Yates*, 438 F.3d 1307 (11th Cir. 2006), the Eleventh Circuit applied *Craig* and determined that witness testimony presented via a live two-way video conference at a criminal trial violated the defendants' right to confrontation. *Id.* at 1309. The witnesses were "essential . . . to the government's case-in-chief," but were unwilling to travel to the United States from Australia to testify. *Id.* at 1310. The trial court's reasoning for permitting the video testimony was that confrontation rights would not be violated because the witnesses would see the defendants and vice versa, the government asserted an important public policy of providing the fact-finder with crucial evidence, and the government had an interest in expeditiously and justly resolving the case. *Id.*

In reversing the trial court, the Eleventh Circuit explained:

> [W]here a defendant's right to confront a witness against him will be affected, the determination of whether a particular case requires a departure from usual procedures must be made, by the trial court, on a case-by-case basis. *Craig*, 497 U.S. at 854, 110 S.Ct. at 3169. The court generally must: (1) hold an evidentiary hearing and (2) find: (a) that the denial of physical, face-to-face confrontation at trial is necessary to further an important public policy and (b) that the reliability of the testimony is otherwise assured. *Id.* at 850, 855, 110

16

> S.Ct. at 3166, 3169. *The first part of this test requires that the trial court find that it is essential to deny the defendant his right to face-to-face physical confrontation in order to serve the interest the government asserts. See, id.* at 855, 110 S.Ct. at 3169 (stating that, in order to separate the witness and defendant, the problem must be the physical presence of the defendant during the witness's testimony, not some other problem that could be remedied by a less intrusive solution).

*Id.* at 1315 (emphasis added).

The *Yates* court held that "under the circumstances of this case (which include the availability of a [Federal Rule of Criminal Procedure 15] deposition), the prosecutor's need for the video conference testimony to make a case and to expeditiously resolve it are not the type of public policies that are important enough to outweigh the Defendants' rights to confront their accusers face-to-face." *Id.* at 1316. "[F]urtherance of the important public policy [must] make it *necessary* to deny the defendant his right to a physical face-to-face confrontation," and the availability of depositions, which the defendants could have attended, removed necessity. *Id.* (emphasis in original). Mere expedition is also not a sufficiently important public policy: "[T]here is no doubt that many criminal cases could be more expeditiously resolved were it unnecessary for witnesses to appear at trial." *Id.*

Because it is United States Supreme Court precedent, this court is duty-bound to apply *Craig* to the case at hand. Thus, the use of Zoom for witness testimony at E.A.C.'s trial should be reviewed for (1) (a) *a case-specific determination of necessity* (b) that furthers an important public policy, and (2) assurance of the reliability of the testimony.

The trial court's error lies in not performing a necessity analysis. Undoubtedly, preventing the spread of the Covid-19 pandemic qualifies as an important public policy, and preventing people from gathering in a courtroom would generally appear to further that policy. But generalities and assumptions are not a substitute for the required case-specific determination of necessity. For example, the trial court did not seek to determine the potential level of risk involved with each witness's possible exposure to Covid-19 through an in-person appearance. Nor did the trial court evaluate the necessity of each witness's proffered testimony with respect to the overall effectiveness of prosecution of the case. Lastly, the trial court did not explore alternatives to Zoom testimony, which would go to the question of "necessity." The trial court might have considered alternatives such as a continuance until community spread of the virus

had decreased or requiring some or all of the witnesses to appear in person and with masks or behind plexiglass barriers and other social distancing infrastructure.[10]  The record is silent as to this required analysis.  The lack of individualized, on-the-record considerations by the trial judge prevents a meaningful review of whether these alternatives were viable.   The majority's attempt to now fill in the gaps by citing to newspaper and local Miami television station stories is risky.

## II.  The Majority Opinion

The majority relies on several reasons for its determination that the child is no longer entitled to his rights under the Confrontation Clause, including that *Craig* is distinguishable, that there were administrative orders permitting remote proceedings in place at the time of the trial, that "all the rules of the game changed" because the trial took place during the pandemic, and that the trial court took great care to conduct the trial fairly.

Respectfully, I assert that these reasons are inherently flawed and cannot justify the abrogation of the United States Constitution.

First, the majority seems to propose that *Craig*'s requirement for a case-specific finding of necessity need not be applied because *Craig* is distinguishable:  "We start from the premise that Craig sets the standard and articulates the analysis for determining the unique issue of when child victims of sexual abuse may appear by closed circuit television.  497 U.S. at 850–60.  It did not address Zoom appearances in non-jury trials during a pandemic."  *Majority op.* at 7.   Agreed, the facts of *Craig* are distinguishable from those at hand *insofar* as they involve the use of one-way closed circuit television for testimony given while the witnesses could not see the defendant.  But for purposes of our analysis, the differences end there particularly because, *Craig has been extended* to two-way remote testimony very similar to that enabled by Zoom in the instant case. *See Yates*, 438 F.3d at 1309 (applying *Craig* and determining that witness testimony presented via a live two-way video conference at a criminal trial violated the defendants' right to confrontation); *Harrell*, 709 So. 2d at 1369

---

[10] Numerous facts may be relevant to the required necessity determination in the context of the ongoing coronavirus pandemic, and I do not purport to proclaim that any or all of these specific facts are determinative.  The knowledge and science surrounding the spread of the virus continues to quickly evolve, and fact-dependent judicial findings must evolve along with it so we know the specific science on the ground that existed during E.A.C.'s case progression.

(applying *Craig* to the testimony given by satellite video transmissions in which defendant could see witnesses and witnesses could see defendant). Also in *Harrell*, our state supreme court expressly declined to conclude that such satellite remote proceedings are the equivalent of physical, face-to-face confrontation. *Id.* at 1368. Accordingly, despite factual distinctions, a connecting of the legal dots leads to the inescapable conclusion that *Craig*'s mandate of "a case-specific finding of necessity" applies to the case at hand.

The majority also points to the supreme court administrative orders in place at the time of E.A.C.'s trial and the requirements therein for remote proceedings. *Majority op.* at 2. But not to be missed is that these orders contain express exceptions to remote proceedings where necessary to honor individual constitutional rights. Amendment 5 to Administrative Order AOSC20-23 included a "GUIDING PRINCIPLE" that "[t]he presiding judge in all cases must consider the constitutional rights of crime victims and criminal defendants and the public's constitutional right of access to the courts." *Id.* at § I.A. The Amendment further directed:

> (2) Non-jury trials in:
>
> a. Criminal cases shall be conducted remotely if the parties agree to such conduct or, if not, shall be conducted in person.
>
> b. … juvenile delinquency cases shall be conducted remotely if ordered by the chief judge or the presiding judge or, if not, shall be conducted in person.
>
> (3) All other trial court proceedings shall be conducted remotely unless a judge determines that one of the following exceptions applies, in which case the proceeding shall be conducted in person:
>
> a. *Remote conduct of the proceeding is inconsistent with the United States or Florida Constitution*, a statute, or a rule of court that has not been suspended by administrative order
> ….

*Id.* at § III.E. (emphasis added).

Likewise, Fifteenth Circuit Administrative Order 12.510-06/2020.12* recognized that remote proceedings must abide the federal and Florida

19

constitutions:

> The fact that one of the above outlined proceedings cannot be held in-person is not a valid reason for continuing the proceeding until in-person proceedings are permitted <u>unless</u> the presiding judge determines that remote conduct of the proceeding:
>
> a. Is inconsistent with the United States or Florida Constitution . . . .

*Id.* at § III.1 (emphasis in original).

Because of these plainly obvious exceptions included in the administrative orders to preserve constitutional rights, the majority cannot reasonably point to either the supreme court order or the circuit court order to justify the trial court's failure to apply *Craig.*

The majority also troublingly points to the pandemic as a reason for denying the child's constitutional rights:

> But significantly, nothing in *Craig* addressed how the standard should be applied when not only the jurisdiction, but the world, is in the middle of a pandemic. Indeed, none of the cases relied upon by the dissent were written during a pandemic. And, but for the pandemic, the dissent might be correct. The problem is this trial took place in a pandemic where all the rules of the game changed.

*Majority op.* at 7.

Somewhere, at least one of our founding fathers is rolling over in his grave. The "rules of the game" are found in the Constitution:

> The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to

20

> preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority.

*Ex parte Milligan*, 71 U.S. at 120-21. Thus, even in times of great exigency, the Constitution remains solidly embedded as the supreme law of the land. Any conclusion to the contrary is—indeed, must be—rendered as being unacceptable. As tempting and convenient as it might be, cutting constitutional corners without utilizing enunciated safeguards must be considered a non-starter.

Clearly, the pandemic was and is a time of intense difficulty, trouble, and danger and was so alarming and abrupt that it has required many major modifications within the operation of the court system. I do not bury my head in the sand to that fact. But this is not the first (nor will it be the last) emergency to test the durability and lastingness of the Constitution. Indeed, that is precisely why *Craig* allows for exceptions to face-to-face confrontation. Public health concerns may well have been an appropriate reason to conduct this trial remotely. But, in the end—respectfully—there is no reason why the trial court could not have made the required case-specific finding of necessity. Such a finding, made following a remote hearing, would not have adversely impacted anyone's health. The trial court may have ultimately determined that remote proceedings were justified and necessary in E.A.C.'s case, but it erred by proceeding without first making a case-specific determination.[11]

The majority suggests that the trial court was permitted to satisfy constitutional concerns by taking "great care" in reading instructions and ensuring the witnesses were in the Zoom electronic "gallery" view. I have no doubt that the trial court was doing its best under very difficult circumstances to endeavor to follow administrative orders and keep participants safe while protecting E.A.C.'s rights. However, there is simply no precedent for substituting the United States Supreme Court mandate of a case-specific finding of necessity with "techniques" developed by the trial court. The majority's analysis begs the question of which other

---

[11] E.A.C. thoroughly preserved this issue by, among other things, filing an extensive written pre-trial motion that cited directly to *Craig*. Indeed, that section of E.A.C.'s motion discussing this issue was captioned: "III. The Court must make an individualized determination for each witness before allowing an exception to face-to-face confrontation." In other words, the trial court was fully apprised of E.A.C.'s objection prior to trial. Had the child not made what was relatively close to a textbook example of a proper objection, we would be summarily affirming the trial court for lack of preservation. This renders the majority's affirmance all the more problematic because *Craig* was and is directly on point and E.A.C.'s attorneys did their jobs.

constitutional rights might we abrogate so long as the trial court acts with "great care."

Finally, the majority points to *R.J.B.*, 482 P. 3d 519, and *Clarington*, 314 So. 3d 495, for support.  It cites *R.J.B.* for its holding that a Web-X hearing in a termination of parental rights case did not violate the mother's due process or equal protection rights.  *Majority op.* at 10.  Respectfully, *R.J.B.* is clearly distinguishable because it does not involve any type of criminal prosecution, and thus the Sixth Amendment was not impacted in any way and was not at issue.  *See, e.g., In the Interest of A.H.*, 950 N.W.2d 27, 35 n.9 (Iowa Ct. App. 2020) (affirming termination of parental rights where hearing was conducted by telephone and noting "there is no Sixth Amendment right to confront witnesses outside the context of a criminal proceeding").

*Clarington* is likewise distinguishable.   There, the Third District addressed a petition for writ of prohibition and concluded that conducting a probation violation hearing remotely in the midst of the Covid-19 emergency did not violate the defendant's due process or confrontation rights.  *Clarington*, 314 So. 3d at 509.

While *Clarington* is thorough and well-reasoned, it does not stand in support of affirmance in the instant case.  There, because the defendant had already been to trial, he had already been afforded the full panoply of due process, which, as is well-established, not equally available to probationers.   *Id.* at 501-02.   In fact, the *Clarington* court carefully "emphasize[d] the narrow scope of [its] decision," pointing out that the opinion denies a petition for a writ of prohibition in the context of a probation violation hearing.  *Id.* at 509.  Here, E.A.C. was facing an initial adjudication of delinquency at *trial,* an obvious critical phase of proceedings which, as noted, afforded E.A.C. the full panoply of due process checks.  The facts in *Clarington* simply do not comport with those at bar.  We are discussing apples and oranges.

### III.  Conclusion

In sum, the trial court may have properly determined that remote proceedings were necessary in E.A.C.'s case, but it erred by doing so without first making a case-specific determination.

While I appreciate the position of the majority every bit as much as the trial court in terms of dealing with Covid-19 head on, certain constitutional principles are immutable.  If they are to be diminished because of exigencies of government, the case law on this must be followed to the

letter. The majority sets a dangerous precedent by failing to uphold the dictates of the Confrontation Clause as interpreted by the Supreme Court in *Craig*, even in the face of a generational global pandemic. Up to this point, there is simply no precedent for exclusion of in-person testimony without the required individualized considerations. "[T]echnological changes in the courtroom cannot come at the expense of the basic individual rights and freedoms secured by our constitutions." *Harrell*, 709 So. 2d at 1372. If this child's constitutional rights are not guaranteed by employing the relatively simple and clearly enunciated case-specific determination requirement imposed by the United States Supreme Court, then no one's are.

I would reverse and remand for the trial court to conduct the required *Craig* analysis before permitting the witnesses to testify remotely. And I nevertheless commend the trial judge for her commitment to justice under onerous circumstances.

*      *      *

**_Not final until disposition of timely filed motion for rehearing._**

23